## IN RE: ANGELES ROCA FIRST JUDICIAL DISTRICT PHILADELPHIA COUNTY

### Appeal of: Angeles Roca

### No. 42 EAP 2016

Supreme Court of Pennsylvania.

Argued: May 9, 2017
Decided: November 22, 2017

---

Kathleen Marie Kotula, Esq., PA Department of State, for Participant Bureau of Commissions, Elections and Legislation.

City Commissioners of Philadelphia, Participant pro se.

Samuel C. Stretton, Esq., for Appellant.

Elizabeth Ann Flaherty, Esq., Robert A. Graci, Esq., Judicial Conduct Board of Pennsylvania, for Appellee.

SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.

## OPINION

### CHIEF JUSTICE SAYLOR

This is an appeal from an order of the Court of Judicial Discipline (the "CJD") removing Appellant from office. One issue we are asked to address is whether that tribunal must apply the doctrine of *stare decisis* when sanctioning a jurist.

### I. Background

The underlying facts were developed at trial before the CJD and via stipulation.[1] At all relevant times Appellant served as a Philadelphia common pleas judge in the family division. Her term overlapped with those of former Philadelphia Municipal Court Judges Joseph Waters and Dawn Segal.[2] During this period, the FBI was investigating Waters' activities; the investigation included wiretap surveillance of his telephone communications. Several conversations between Waters and Appellant were recorded in 2011 and 2012.

In September 2011, Appellant called Waters regarding Judge Adam Beloff.[3] In the call, Appellant told Waters that the son of a court employee was to appear before Beloff on drug charges and asked whether Beloff would be receptive to discussing that case *ex parte*, to which Waters responded in the affirmative. Appellant then

---

1. *See* Judicial Conduct Board Second Amended Pre–Trial Memorandum at 5–15 (setting forth the Board's proposed stipulation); N.T., Sept. 8, 2016, at 14 (reflecting Appellant's concurrence with the stipulation and the CJD's acceptance of it into the record).

2. Former Judge Waters later resigned from office and pled guilty to federal corruption charges. Separately, the CJD removed former Judge Segal from office. For brevity they will be referred to simply as Waters and Segal.

3. Beloff, a Philadelphia common pleas judge in the criminal division, died in 2012.

confirmed that she had Beloff's phone number, and Waters stated that he would speak with Beloff in person. *See* Board Exh. 17, transcript, at 1–2.

In June 2012, Appellant asked Waters for advice on how her son, Ian Rexach, should proceed relative to a tax judgment. By way of background, Rexach owned a barbershop in Philadelphia. The city filed a code enforcement complaint against him for failure to pay the city's business privilege tax. When he did not appear for the hearing, a $5,000 default judgment was entered against him. He filed a *pro se* petition to open the judgment, which was denied due to the lack of a meritorious defense. Thereafter, a phone conversation occurred between Appellant and Waters, which included the following excerpt:

> Appellant: I have a question . . . Can you file a motion for reconsideration with [Segal]?
>
> Waters: Yeah. You file a Motion for Reconsideration with her and I'll talk to her.
>
> Appellant: Huh?
>
> Waters: I said file a Motion for Reconsideration with her and I'll talk to her.
>
> Appellant: Okay.
>
> Waters: Why didn't you call me first?
>
> Appellant: Because I didn't know it was late, so I just sent him over and I said, "Just go open it." I didn't know it was beyond the 30 day period. Otherwise, I would have called.
>
> Waters: Yeah.
>
> Appellant: It was on May 15th and he wrote in the petition, "I apologize I got this mixed up with another court date in Municipal Court," and then he wrote, "I wish to reopen my case so that I can resolve this matter and make payments." The bitch denied it. That's a pretty good . . . [laughs] . . . I mean it's not a legal defense, but give me a break.

Stipulation ¶ 19. From the above, Appellant understood that Waters would talk to Segal about the petition in her son's case. Appellant did not attempt to dissuade him from doing so. *See id.* ¶ 20.

Appellant learned that Segal would not be presiding over these types of petitions after June 29, 2012. Seeking to ensure that Segal presided over her son's petition, on June 29, 2012, Appellant called Waters to encourage him to intervene, as follows:

> Appellant: Do you have [Segal's] number?
>
> Waters: Who?
>
> Appellant: Dawn Segal.
>
> Waters: Uh.
>
> Appellant: He [Rexach] just filed for reconsideration. They said she [Segal] does 'em right today. So we need to call her today.
>
> Waters: Oh. Okay. I'll call Dawn right now. All right.
>
> Appellant: It's Ian Rexach. She said call Monday and by Monday she [Segal] would have already decided the decision [sic].
>
> Waters: All right. What's his name?
>
> Appellant: It's Ian Rexach . . . .
>
> Waters: . . . I'll call her right now.
>
> Appellant: And it was a Motion for Reconsideration. All right?
>
> Waters: All right. Bye-bye.
>
> Appellant: Thank you . . . .

*Id.* ¶ 27. From this conversation, Appellant understood that Waters would call Segal on behalf of Appellant's son in regard to the petition for reconsideration. *See id.* ¶ 28.

That day, Segal reviewed the petition for reconsideration and issued a rule to show cause why the relief requested should not be granted. Although Segal did not preside over Rexach's case thereafter, on July 1, 2012, she called Waters to advise him that she "took care of it" and to "tell her it's done." Waters then called

Appellant and left a voice message stating that Segal had just stated that "she took care of that thing," *i.e.*, Rexach's petition for reconsideration. Waters again called Appellant and discussed the matter, confirming that it had been "taken care of" by Segal. Appellant responded, "All right. Cool. Thanks." The default judgment against Rexach was ultimately vacated and the case against him was withdrawn upon his payment of $477 in taxes. *Id.* ¶¶ 30–39.

In 2013, FBI agents interviewed Appellant in the presence of her attorney. During the interview, Appellant denied that judges call each other asking for favors. She stated, "We don't do that here at all." Stipulation ¶ 41. She added that she would never call another judge to request a favor for a family member. *See id.* ¶¶ 42–43. Further, when asked in the interview what she would do if a family member was in trouble, Appellant stated that "they would be on their own." N.T., Sept. 8, 2016, at 187.

In March and May of 2015, the Judicial Conduct Board sent Appellant informal letters of inquiry concerning her contacts with other judges. At the time, Appellant was unaware that her conversations with Waters had been recorded. In her written responses, Appellant made several representations which were inconsistent with the content of the recorded phone conversations. For example, she indicated that: she only had one conversation with Waters, limited to procedural advice about a petition for reconsideration in the *City of Philadelphia v. Rexach* matter; after advising her son to file a motion for reconsideration, she had no further contemporaneous knowledge about the case; she never requested preferential treatment in the *Rexach* case and, to her knowledge, none

was given; Waters never offered to request special consideration from Segal; Appellant was not aware of whether Waters actually had contacted Segal, and if Waters did contact Segal, it was without Appellant's knowledge. *See id.* ¶¶ 44–55.

After Appellant met with a federal prosecutor and heard the recordings of the intercepted conversations, she supplemented her written responses to the Board, admitting that Waters offered to speak to Segal on her behalf, and that she did not discourage him from taking such action. Appellant also conceded that she had placed a second call to Waters asking him to request that Segal consider the *Rexach* matter promptly, and that Waters eventually told Appellant it was "taken care of." Appellant added, "I should have stayed out of the matter completely." *Id.* ¶¶ 56–61.

Finally, despite her knowledge that Waters engaged in *ex parte* communication with Segal, Appellant did not report his misconduct to the Board. *Id.* ¶ 62.

In June 2016, the Board filed an amended complaint with the CJD alleging that Appellant had violated Article V, Sections 17(b) and 18(d)(1) of the Pennsylvania Constitution, as well as several provisions of Pennsylvania's former Code of Judicial Conduct (the "Code"), mentioned below.[4] The alleged Section 17(b) violation was derivative of a Code violation, as Section 17(b) prohibits judges from "violat[ing] any canon of legal or judicial ethics prescribed by the Supreme Court." PA. CONST. art. V, § 17(b). As for Section 18(d)(1), that provision states that judicial officers may not engage in conduct which, among other things, "prejudices the proper administration of justice or brings the judicial office into disrepute," PA. CONST. art. V, § 18(d)(1), and it also indicates that any

---

4. The former code took effect in 1974 and was amended periodically. It was replaced entirely on July 1, 2014. Because the alleged misconduct occurred before that date, the former code presently applies. Accordingly, in this opinion we will refer to the Code of Judicial Conduct and its canons as reflected in the former code.

transgression of these standards or of Section 17 can subject the jurist to discipline, up to and including suspension or removal from office. *See id.* The complaint alleged that Appellant had, indeed, prejudiced the proper administration of justice or brought the judicial office into disrepute.

The Code provisions at issue were Canons 2A, 2B, and 3A(4), which state:

**Canon 2. Judges should avoid impropriety and the appearance of impropriety in all their activities.**

A. Judges should . . . conduct themselves at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.
B. Judges should not allow their family, social, or other relationships to influence their judicial conduct or judgment. They should not lend the prestige of their office to advance the private interests of others; nor should they convey, or knowingly permit others to convey the impression that they are in a special position to influence the judge.
**Canon 3** . . . .
**A. Adjudicative responsibilities** . . . .
(4) Judges ... except as authorized by law, must not consider ex parte communications concerning a pending proceeding.

Code of Judicial Conduct (1974), Canons 2A, 2B, 3A(4).

Appellant filed an omnibus pre-trial motion, which was denied. She elected not to file a responsive pleading, however, at which point the complaint's factual allegations were deemed denied. *See* C.J.D.R.P. No. 413.

The case proceeded to trial at which the CJD heard the evidence summarized above. In regards to the 2011 call, Appellant testified that she never followed through and contacted Beloff because she "knew it was not the right thing to do." N.T., Sept. 8, 2016, at 218; *see also id.* at 170–71, 192. When asked about her state-

ments, during the FBI interview, that judges do not call one another and that a family member in trouble would be "on their own," Appellant confirmed she gave those answers, but indicated she thought the questions pertained only to Family Court and that the term "trouble" was limited to criminal charges. *See* N.T., Sept. 8, 2016, at 185–87. As for the Board's letters of inquiry, Appellant admitted that her responses were incorrect, but she attributed that to a lapse of memory inasmuch as the letters were sent almost three years after the events in question. *See id.* at 188–90, 210. During her testimony, Appellant acknowledged on several occasions that her conduct was wrong and emphasized that her ethical failing was based solely on a desire to help her son and would never happen again. *See, e.g., id.* at 192–95.

By opinion and order dated October 20, 2016, the CJD found Appellant in violation of Canons 2A and 2B and, by extension, Article V, Section 17(b) of the Constitution. The court also ruled that Appellant had transgressed Article V, Section 18(d)(1) of the Constitution by engaging in conduct which brought the judicial office into disrepute and prejudiced the proper administration of justice.

In reaching its holdings, the court took note of the Board's position that "the provision of 'favoritism' upon *ex parte* requests, for the benefit of those who are politically connected or are family members or friends of judges or other court employees, has for too long haunted our state judiciary." *In re Roca*, No. 14 JD 2015, *slip op.* at 22 (Pa. Ct. Jud. Disc. Oct. 20, 2016) (quoting N.T., Sept. 18, 2016, at 23). In terms of whether Appellant's conduct brought the judicial office into disrepute, the court observed that the standard for such inquiry is based on the reasonable expectations of the public, which include a belief that judicial officers will not make

overt, *ex parte* attempts to influence case outcomes to benefit family members. The court explained that the record was "replete with references to the intercepted phone calls between former Judge Waters and [Appellant]. These were clear, overt, and *ex parte* steps taken to influence the case in favor of Ian C. Rexach." *Id.* at 24. The court added that "disrepute 'may result where the actions took place inside or outside of court proceedings.'" *Id.* (quoting *In re Carney*, 621 Pa. 476, 494, 79 A.3d 490, 501 (2013)).

The CJD made similar underlying findings to support its conclusion that Appellant had prejudiced the proper administration of justice and violated Canons 2A and 2B. *See id.* at 24–26. However, the court found it unnecessary to reach the question of whether Appellant violated Canon 3A(4), as it viewed the asserted conduct underlying that charge as having been addressed in ruling on the other counts of the complaint. *See id.* at 26. In this regard, the court explained that, unlike in criminal matters, the full range of sanctions is available based on a single violation, and its discretion in imposing discipline is not grounded on the number of ways the same conduct offended the Constitution or the Code, but on the nature of the conduct together with any mitigating or aggravating circumstances. *See id.* at 26 (quoting *In re Eagen*, 814 A.2d 304, 306–07 (Pa. Ct. Jud. Disc. 2002)).

After Appellant waived objections and exceptions to the CJD's ruling, a sanctions hearing was held at which several character witnesses appeared on Appellant's behalf. Appellant also testified, stating that she accepted full responsibility for her actions and apologizing for her misconduct.

█ The CJD imposed the sanction of removing Appellant from the bench and barring her from holding judicial office in the future. *See In re Roca*, 151 A.3d 739, 740, 744 (Pa. Ct. Jud. Disc. 2016). The court reviewed the ten non-exclusive factors it routinely considers, and how those applied to the present case.[5] It then acknowledged the "honest regrets extended by" Appellant, and additionally expressed appreciation for the input provided by Appellant's character witnesses. *Id.* at 743.

The court observed, however, that "good character evidence does not undo" unethical behavior, and that the focus of a sanctions decision goes beyond the individual jurist to the "message sent to the public and the effect on the expectation of standards of behavior." *Id.* (quoting *In re Berkhimer*, 593 Pa. 366, 374, 930 A.2d 1255, 1259 (2007)). Thus, the CJD noted that the proceedings are not chiefly punitive in nature, but rather, are aimed at protecting citizens from judicial abuse and corruption. As it was clear from the record that Appellant's actions were undertaken voluntarily and with a motive to obtain special judicial treatment for her son, the court determined that she engaged in willful misconduct. The court concluded:

> It cannot be reasonably disputed that Judge Roca, at first, only requested advice from former Judge Waters, but then the conversation clearly fell into an agreement to obtain *ex parte* contacts with the judge handling her son's case.

---

**5.** The factors are: (1) whether the conduct is an isolated event or part of a pattern of conduct; (2) the nature, extent, and frequency of the acts of misconduct; (3) whether the conduct occurred in or out of the courtroom; (4) whether the conduct occurred in the judge's official capacity or in her private life; (5) whether the judge has acknowledged or recognized that the acts occurred; (6) whether the judge has evidenced an effort to change or modify her conduct; (7) the judge's length of service on the bench; (8) whether there have been prior complaints about the judge; (9) the conduct's effect on the integrity of, and respect for, the judiciary; and (10) the extent to which the judge exploited her position to satisfy her personal desires. *See id.* at 742–43.

However, rather than refuse to participate in this scheme, she fully complied and willfully participated in the scheme. As we have said in more detail in prior decisions, when it comes to corrupt acts and the derogation of a fair and just judicial process, a judge must have the willingness to stand up for what [is] right and buck a corrupt tide.

*Id.* (internal quotation marks omitted).

On appeal, Appellant alleges that the CJD's removal-and-bar sanction is unduly harsh under the circumstances. She requests relief in the form of a lesser penalty such as a six-month or one-year suspension. In this respect, Appellant maintains, first, that this Court is not bound by the state constitutional provision, discussed below, which limits our review of the sanction imposed by the CJD to whether it was lawful. In the alternative, Appellant proffers that the punishment was not lawful because it was inconsistent with that court's prior decisions in cases where the misconduct was not extreme.[6] These arguments are discussed below.

## II. Analysis

The mechanism for disciplining jurists, as reflected in the 1968 state charter, involved this Court acting in the first instance on the recommendations of an investigative body called the Judicial Inquiry and Review Board (the "JIRB"). *See, e.g., In re Larsen,* 532 Pa. 326, 616 A.2d 529 (1992). The Constitution was materially amended in 1993. In the wake of such amendments, this Court retains supervisory and administrative authority over all of

Pennsylvania's courts and justices of the peace, *see* Pa. Const. art. V, § 10(a), the JIRB no longer exists, and the disciplinary apparatus is separated into distinct prosecutorial and adjudicative functions to be carried out by the Board and the CJD, respectively. *See id.* § 18(a), (b). Under the new scheme, this Court exercises appellate review of the CJD's final disciplinary orders. *See id.* § 18(c). *See generally In re Bruno,* 627 Pa. 505, 521–23, 101 A.3d 635, 644–45 (2014) (summarizing this history).[7] In particular, judges may appeal from an adverse final order of the CJD, *see* Pa. Const. art. V, § 18(c)(1), and—although not implicated here—the Board may appeal from a final order dismissing its complaint. *See id.* § 18(c)(3).

### A. Standard of review

Per the 1993 amendments, the Constitution is fairly explicit in prescribing the manner of our appellate review:

On appeal, the Supreme Court ... shall review the record of the proceedings of the [CJD] as follows: on the law, the scope of review is plenary; on the facts, the scope of review is clearly erroneous; and, as to sanctions, the scope of review is whether the sanctions imposed were lawful. The Supreme Court ... may revise or reject an order of the [CJD] upon a determination that the order did not sustain this standard of review; otherwise, the Supreme Court ... shall affirm the order of the [CJD].

Pa. Const. art. V, § 18(c)(2).[8]

■ Pursuant to the above, and in terms of our consideration of the sanction

---

**6.** This Court permitted limited oral presentations on this latter issue, which we framed for argument as follows:

When imposing sanctions, is the Court of Judicial Discipline bound to follow the doctrine of stare decisis and thus required to follow its prior decisions when sanctioning a jurist?

*In re Angeles Roca First Judicial Dist. Phila. Cnty.,* No. 42 EAP 2016, Order (Pa. Mar. 31, 2017).

**7.** An entity called a "special tribunal" performs appellate review in cases where a justice of this Court is subject to discipline. *See* Pa. Const. art. V, § 18(c)(1).

**8.** The drafters used the terms scope of review

imposed, we do not substitute our concept of the appropriate penalty for that chosen by the CJD. Rather, we ask whether the sanction is "lawful."

Appellant contends in her first issue that, after *Bruno*, we are not constrained by this constitutional text. She reasons that, in *Bruno*, this Court "amended and limited the powers set forth in Article V, Section 18," insofar as it "found that [its] King's Bench authority transcended the other powers enumerated in the Constitution and the Judicial Code." Brief for Appellant at 54. She therefore asserts that we now have "parallel jurisdiction with full rights to intervene" in a matter involving judicial discipline and, in doing so, to exercise *de novo* review. *Id.* at 55.

■■■ This is a difficult argument to maintain. It is established that "[t]he Constitution is the fundamental law of our [C]ommonwealth, and in matters relating to alterations or changes in its provisions, the courts must exercise the most rigid care to preserve to the people the right assured to them by that instrument." *Commonwealth ex rel. Schnader v. Beamish*, 309 Pa. 510, 515, 164 A. 615, 616–17 (1932). Our state charter, which comprises "the Commonwealth's organic law," *Driscoll v. Corbett*, 620 Pa. 494, 510, 69 A.3d 197, 207 (2013), may be amended "in the manner specifically set forth therein, or a new one may be put in force by a convention duly assembled, its action being subject to ratification by the people, but *these are the only ways* in which the fundamental law can be altered." *Stander v. Kelley*, 433 Pa.

406, 410–11, 250 A.2d 474, 476 (1969) (emphasis altered, internal quotation marks, citation, and footnote omitted). Further, "[n]othing short of a literal compliance with this mandate will suffice." *Pa. Prison Soc'y v. Commonwealth*, 565 Pa. 526, 538, 776 A.2d 971, 978 (2001) (internal quotation marks and citation omitted). Therefore, we differ with Appellant's evident premise, that a decision of this Court is capable of "amending" constitutional text such as the prescribed review standard as set forth in Article V, Section 18(c)(2).

Additionally, Appellant misinterprets *Bruno*. That case related to the interplay between this Court's supervisory powers over the Unified Judicial System (including its employees) and the CJD's constitutionally-based authority—in relation to a judicial officer charged with a felony—to issue a non-appealable order suspending the jurist on an interim basis. *See* Pa. Const. art. V, § 18(d)(2). The particular dispute arose when the CJD suspended Judge Bruno with pay after this Court had suspended him without pay. The conflict between the two suspension orders, in turn, raised the issue of whether, in light of the CJD's interim-suspension authority, this Court's supervisory powers still included the ability to suspend a jurist charged with a felony.

The *Bruno* Court ultimately held that, pursuant to this Court's King's Bench authority, our power of interim suspension subsists alongside that of the CJD, but it should be reserved for "extraordinary circumstances." *Bruno*, 627 Pa. at 583, 101 A.3d at 682.[9] Inasmuch as the two irrecon-

---

and standard of review synonymously, as the phrase, "this standard of review," clearly refers back to the three prescribed scopes of review. Although this Court has, in some contexts, stated that scope and standard refer to different aspects of appellate review, *see, e.g.*, *In re L.J.*, 622 Pa. 126, 137–38, 79 A.3d 1073, 1079–80 (2013) (motion to suppress evidence); *Morrison v. DPW, Office of Mental Health (Woodville State Hosp.)*, 538 Pa. 122,

131–33, 646 A.2d 565, 570–71 (1994) (motion for a new trial), that specific terminology has no application here in light of the constitutional text.

9. For example, a judge charged with a felony in relation to his actions as a jurist might continue to preside over criminal cases. *See, e.g.*, *In re Franciscus*, 471 Pa. 53, 369 A.2d 1190 (1977). If the CJD does not suspend the

cilable suspension orders continued in existence, the *Bruno* Court also concluded that this Court's order was "supreme and controlling" over that of the CJD. *Id.* at 516, 101 A.3d at 641 (internal quotation marks omitted).

Appellant reads *Bruno* as implying that, where the integrity of the judicial system demands it, this Court can assert its supervisory power so as to disregard the standard of review set forth in Article V, Section 18(c)(2). Such a precept cannot reasonably be derived from *Bruno*. Nothing in *Bruno* suggests that this Court's supervisory responsibilities can justify acting contrary to, overriding, or essentially re-writing the text of the Constitution. Rather, *Bruno* explained that the CJD's suspension powers, as set forth in the Constitution, are not made to be exclusive. By contrast, the Court explained, where the Constitution gives explicit "direction[s] as to how a thing is to be done," those directions must be followed to the exclusion of all other means that may be deemed "better or more convenient." *Bruno*, 627 Pa. at 579 n.24, 101 A.3d at 680 n.24 (quoting *In re Bowman*, 225 Pa. 364, 367, 74 A. 203, 204 (1909)).

Even more to the point, in issuing its interim suspension order this Court emphasized it was not punishing the jurist or imposing disciplinary sanctions, and that the constitutionally assigned standard for this Court's review of the CJD's final order of discipline remained unaffected. *See id.* at 591, 101 A.3d at 687. *See generally Commonwealth v. Russo*, 388 Pa. 462, 471, 131 A.2d 83, 88 (1957) (affirming that this Court has "no right to disregard or ... erode or distort any provision of the Constitution, especially where, as here, its ... language make[s] its meaning unmistak-

ably clear"). Therefore, our present standard of review, as prescribed by Section 18(c)(2), remains unaffected by any aspect of *Bruno*.

## B. Lawfulness and consistency with prior disciplinary decisions

The Constitution sets forth the sanctions which the CJD may impose upon a judicial officer subject to disciplinary action:

A justice, judge or justice of the peace may be suspended, removed from office or otherwise disciplined for conviction of a felony; violation of section 17 of this article; misconduct in office; neglect or failure to perform the duties of office or conduct which prejudices the proper administration of justice or brings the judicial office into disrepute, whether or not the conduct occurred while acting in a judicial capacity or is prohibited by law; or conduct in violation of a canon or rule prescribed by the Supreme Court.

PA. CONST. art. V, § 18(d)(1); *see also id.* § 18(b)(5) ("A decision of the [CJD] may order removal from office, suspension, censure or other discipline as authorized by this section and as warranted by the record.").

There is no dispute that this authorizes the CJD to remove a judge from office upon a finding that he or she committed misconduct, either by violating a canon or rule prescribed by this Court, or by conduct which, *inter alia*, brings the judicial office into disrepute or prejudices the proper administration of justice. Nor is there any challenge to the conclusion that Appellant did, in fact, violate rules of conduct, bring the judicial office into disrepute, and prejudice the proper administration of justice: as noted, Appellant waived

judge within a reasonable time, an extraordinary circumstance may arise necessitating the exercise of our supervisory powers so as to "protect[ ] the fairness and probity of the judi-

cial process, and the integrity, dignity, and authority of the Unified Judicial System." *Bruno*, 627 Pa. at 586, 101 A.3d at 684.

objections and exceptions to the CJD's determinations in this regard.

Nevertheless, Appellant posits that the sanction of removal was not lawful in light of precedent and the facts of this case. She relies on CJD decisions in which a lesser sanction was imposed for misconduct which she views as equivalent to (or worse than) her own. Her argument rests on the premise that the CJD acts unlawfully when it sets a penalty which is out of proportion to those imposed in previous, similar cases. This reasoning implicates the issue we framed, in terms of *stare decisis*, for oral argument. *See supra* note 6. We will address the question on such terms, and—for completeness—on the terms framed by Appellant with regard to proportionality and the record.

## 1. Stare decisis

■ "The doctrine of *stare decisis* maintains that for purposes of certainty and stability in the law, 'a conclusion reached in one case should be applied to those which follow, if the facts are substantially the same, even though the parties may be different.'" *Stilp v. Commonwealth*, 588 Pa. 539, 620, 905 A.2d 918, 966–67 (2006) (quoting *Burke v. Pittsburgh Limestone Corp.*, 375 Pa. 390, 394, 100 A.2d 595, 598 (1953)). In this formulation the terms "conclusion" and "in the law" are particularly meaningful because *stare decisis* relates primarily to rules or pronouncements of law. *See, e.g., Agostini v. Felton*, 521 U.S. 203, 235, 117 S.Ct. 1997, 2016, 138 L.Ed.2d

391 (1997) ("The doctrine of *stare decisis* ... reflects a policy judgment that 'in most matters it is more important that the applicable rule of law be settled than that it be settled right'" (quoting *Burnet v. Coronado Oil & Gas Co.*, 285 U.S. 393, 406, 52 S.Ct. 443, 447, 76 L.Ed. 815 (1932) (Brandeis, J., dissenting))); *Estate of Grossman*, 486 Pa. 460, 470, 406 A.2d 726, 731 (1979) (reciting that *stare decisis* "permits the orderly growth processes of the law to flourish" (internal quotation marks and citation omitted)); 20 Am. Jur. 2d *Courts* § 129 ("For a court to apply a precedent as stare decisis, there must have been a judicial opinion on a point of law.").[10]

By contrast, the above-quoted provisions of the Pennsylvania Constitution do not reflect an intent that the discipline imposed in one case should become precedent for later cases. Instead, they give wide latitude to the CJD in arriving at the appropriate discipline upon a predicate finding that a jurist violated a canon or rule, or Section 17 or 18(d)(1) of Article V. Furthermore, while legal rules have developed to guide a sentencer's discretion when imposing a penalty in the distinct, albeit somewhat analogous, arena of criminal sentencing, *see generally Graham v. Collins*, 506 U.S. 461, 488–89, 113 S.Ct. 892, 909–10, 122 L.Ed.2d 260 (1993) (Thomas, J., concurring) (discussing the impact of *stare decisis* upon procedural requirements surrounding imposition of the death penalty), Appellant does not for-

---

**10.** *See also Beaulieu v. Beaulieu*, 265 A.2d 610, 613 (Me. 1970) (explaining that failing to adhere to *stare decisis* entails a "deviation [from] earlier pronouncements of law which are unsuited to modern experience"); *State v. Waine*, 444 Md. 692, 122 A.3d 294, 299 (2015) (noting that the court, in an earlier case, had applied *stare decisis* in reaching certain legal conclusions); *Otter Tail Power Co. v. Von Bank*, 72 N.D. 497, 8 N.W.2d 599, 607 (1942) ("The rule of stare decisis is a rule of policy grounded on the theory that when a legal

principle is accepted and established, rights may accrue under it and security and certainty require that the principle be recognized and followed ...."); *Stranahan v. Fred Meyer, Inc.*, 331 Or. 38, 11 P.3d 228, 237 (2000) (couching *stare decisis* in terms of prior decisions on "a question of law" (internal quotation marks and citation omitted)); *Horne v. Moody*, 146 S.W.2d 505, 509 (Tex. Ct. Civ. App. 1940) (expounding that *stare decisis* is a doctrine "based upon the statement of a principle, rule or proposition of law").

ward an argument predicated on a discretion-channeling legal principle which has been developed by the CJD or this Court. Rather, she, in effect, urges this Court to adopt such a rule based on an asserted requirement of proportionality in relation to prior sanctions imposed by the CJD.

## 2. Proportionality in light of prior cases

The concept that the penalty decided upon by the CJD should be subject to a proportionality requirement is not without some appeal. In some jurisdictions where, as with the pre–1993 JIRB-based framework, the commission makes a recommendation to be acted on *de novo* by the state supreme court, that court expressly takes precedent into account. *See, e.g., Comm'n on Judicial Performance v. Boone*, 60 So.3d 172, 185 (Miss. 2011) (reciting that the appropriateness of the sanction recommended by the judicial performance commission is assessed with reference to six factors, including whether there is any case law on point).

█ The difficulty for Appellant is that no such mandate is contained, or even suggested, in Article V, Sections 18(c)(2) and 18(d)(1). For us to forge a path along the lines suggested by Appellant, we would have to overlay upon those provisions a comparative-sanctions regime that cannot fairly be gleaned from their text.[11] We would additionally do violence to the clear implication, arising from the 1993 amendments, that this Court's review of the ultimate sanction imposed by the CJD is high-

ly restricted. As explained, our review is only for lawfulness. *Compare In re Merlo*, 619 Pa. 1, 24, 58 A.3d 1, 15 (2012) (observing that Article V, Section 18 "sets forth removal as an available sanction for bringing disrepute upon the judicial office"), *with In re Melograne*, 571 Pa. 490, 499, 812 A.2d 1164, 1169 (2002) (holding that the CJD's disbarring of a former judge from the practice of law was unlawful because this Court has exclusive disbarment authority). *See generally Berkhimer*, 593 Pa. at 374–75, 930 A.2d at 1259 (noting that this Court reviews sanctions for lawfulness and does not re-weigh the penalty against aggravating and mitigating circumstances).

█ In light of this constricted review and the lack of constitutional language tending to limit or guide the CJD in arriving at the appropriate discipline, the CJD has wide discretion to fashion the appropriate penalty once it finds a predicate violation. *See, e.g., Merlo*, 619 Pa. at 24, 58 A.3d at 15 (rejecting an argument similar to Appellant's, namely, that the sanctions imposed were "unlawful because they are greater than those imposed in other cases"). Moreover, this Court has clarified that "[s]imilarity of misconduct does not require identicality of sanction, for there are other factors that bear on that decision, including mitigating and aggravating considerations and how a particular jurist's misconduct undermines public confidence in the judiciary." *Id.* at 24, 58 A.3d at 14–15 (quoting *In re Lokuta*, 608 Pa. 223, 262, 11 A.3d 427, 450 (2011)).[12]

---

11. Appellant's brief does not include a claim that the application of this aspect of our state charter is limited by any provision of the United States Constitution. For its part, the dissent suggests that our explanation of the appropriate standard of appellate review "is patently violative of the United States Constitution." Dissenting Opinion, at 1210. However, to be lawful, the sanction issued by the

CJD clearly must comport with the federal Constitution. As noted, there simply are no such issues raised in this appeal.

12. Under Section 18(b)(5), the sanction must be "warranted by the record." PA. CONST. art. V, § 18(b)(5). Notably, that provision focuses on the record of the case at hand, and not the discipline meted out in earlier cases involving different judges. The interplay between Sec-

We acknowledge Appellant's belief that it appears unfair for her to be removed from office when earlier instances of judicial corruption, which she views as similar, were met with a lesser penalty. However, it is difficult to draw an equivalence among distinct cases of judicial misconduct, as the factors involved in each instance will naturally vary. The Wisconsin Supreme Court has elaborated on this point:

> Past judicial misconduct cases ... are of limited usefulness in setting the sanction appropriate for this case, which involves unique circumstances. We have not established, nor will we here, a "bright line" standard when, for example, reprimand or censure is warranted as opposed to suspension. Each case is different, and is considered on the basis of its own facts.

*In re Crawford*, 245 Wis.2d 373, 629 N.W.2d 1, 11 (2001); *accord Broadman v. Comm'n on Judicial Performance*, 18 Cal.4th 1079, 77 Cal.Rptr.2d 408, 959 P.2d 715, 734 (1998) ("Proportionality review based on discipline imposed in other cases ... is neither required nor determinative. The factual variations from case to case are simply too great to permit a meaningful comparison in many instances."). *See generally* Cynthia Gray, *A Study of State Judicial Discipline Sanctions* 81–82 (Am. Judicature Soc'y 2002) (enumerating 39 factors which courts have identified as relevant to the selection of an appropriate sanction, divided into the following categories: the nature of the misconduct; the extent of the misconduct; the judge's culpability; the judge's conduct in response to the initiation of disciplinary proceedings; and the judge's record).

■ It follows from the discretionary nature of the CJD's discipline determination that some degree of variance is inevitable. The CJD will always be guided by its institutional obligation to protect citizens

from improper judicial behavior, deter future judicial misconduct, protect the integrity of the Commonwealth's judicial system, and re-establish the probity of, and public trust in, the court affected by the misconduct in question. This Court has repeatedly stated that imposition of discipline "not only punishes the wrongdoer, but also repairs the damaged public trust and provides guidance to other members of the judiciary regarding their conduct." *Berkhimer*, 593 Pa. at 375, 930 A.2d at 1260 (internal quotation marks and citation omitted).

As well, a judge who commits misconduct after other judges have been sanctioned for similar misconduct has the benefit of the CJD's earlier decisions. As a result, "it is not unreasonable for the second, third, or fourth judge who commits a particular type of misconduct to receive a more severe sanction than the first judge who did so." Gray, *A Study of State Judicial Discipline Sanctions* 66; *see also id.* at 66–67 (documenting a trend by the Mississippi Supreme Court of increasingly severe discipline for ticket fixing, culminating in the removal of a jurist after the court's "prior attempts to send a strong message to judges concerning ticket-fixing had 'fallen on deaf ears'" (quoting *Comm'n on Judicial Performance v. Chinn*, 611 So.2d 849, 857 (Miss. 1992))); *accord In re Waddick*, 232 Wis.2d 733, 605 N.W.2d 861, 866 (2000) (*per curiam*) (indicating that a harsher sanction was appropriate than in a prior case involving similar misconduct, in part, because the judge had the benefit of the court's prior decision "to appreciate how seriously the court views" that type of misconduct). Therefore, the CJD's view of the appropriate sanction for a particular type of misconduct may be adjusted as time and experience help to shape that tribunal's understanding of the

---

tion 18(b)(5) and our review for lawfulness is addressed below.

measures which are necessary to achieve its institutional purposes as delineated above.

Thus, while the CJD is certainly capable of consulting prior decisions as a guide to the proper discipline for a given jurist, neither the Pennsylvania Constitution nor any other legal authority which has been brought to our attention requires it to impose sanctions which are proportional to the punishment meted out in earlier cases involving similar misconduct.

## C. Lawfulness in light of the record

 Appellant also argues that removal is "extremely harsh" and "unwarranted under the facts of this case." Brief for Appellant at 50, 58. Although she does not reference Article V, Section 18(b)(5) as such, her contention implicates that paragraph's indication that the CJD may "order removal from office, suspension, censure, or other discipline as authorized by this section *and as warranted by the record*." PA. CONST. art. V, § 18(b)(5) (emphasis added). Because the CJD may lawfully impose discipline warranted by the record, the unavoidable corollary is that a sanction which is *not* warranted by the record is not lawful and, as such, may be disapproved by this Court.

 We view this as a limitation on the concept that we must so limit our review that the only question we address, in terms of the sanction, is whether it falls into a category which is theoretically "available" to the CJD. *See, e.g., Berkhimer*, 593 Pa. at 375, 930 A.2d at 1260 (indicating that removal was a lawful sanction because the Constitution "sets forth removal as an available sanction for bringing disrepute upon the judicial office"). The "available" litmus, standing alone, would be very broad, particularly in view of the open-ended categorization of the forms of discipline that the CJD may mete out. *See* PA. CONST. art. V, § 18(d)(1) (stating that a

jurist who commits misconduct may be suspended, removed from office, "or otherwise disciplined"); *id.* § 18(b)(5) (containing similar language couched in terms of any "other discipline" authorized by Section 18). Hence, under the warranted-by-the-record prerequisite, this Court is able to perform a final check in cases of an infraction met with an unreasonably harsh penalty completely out of proportion to the misconduct involved.

With the above principles in mind—and regardless of whether we would have removed Appellant from office if we were deciding on the appropriate sanction in the first instance—we ultimately reject Appellant's contention that her removal from office was unwarranted by the record in this case. As the CJD pointed out, although Appellant at first only sought procedural advice from Waters, via *ex parte* communications she eventually solicited and accepted the assistance of both Waters and Segal to obtain special consideration for her son's court case—consideration which other litigants would not have had available. In the context of this controversy it is uncontested that Appellant's actions prejudiced the proper administration of justice and brought the judicial office into disrepute. Against such backdrop it was not unreasonable for the CJD to conclude that Appellant's removal from the bench was an appropriate sanction in light of all of the facts of the case.

## D. The dissent's common law argument

Notwithstanding the above, Justice Donohue, in dissent, would read into the constitutional text a requirement of proportionality as between sanctions imposed in distinct, unrelated cases. To bring such requirement within our standard of review, the dissent suggests discipline imposed by the CJD that is not proportional to that imposed in other, similar cases is unlawful.

*See* Dissenting Opinion, at 1203-04. This view is grounded on the premise that, as a common law matter, comparative proportionality is required, and the dissent goes so far as to claim that we are "abrogat[ing] a foundational precept of our common law system of jurisprudence." *Id.* at 1198.

 We respectfully differ with the dissent's premise. To provide context, we consider how the law has developed within the context of one of the most prominent punitive regimes: criminal sentencing. In that arena, a distinction has been drawn between *comparative* proportionality review and *inherent* proportionality review. *See, e.g., Commonwealth v. Gribble,* 550 Pa. 62, 703 A.2d 426, 438 (1997), *abrogated on other grounds, Commonwealth v. Burke,* 566 Pa. 402, 412–13, 781 A.2d 1136, 1142 (2001). Under comparative review, an appellate court "asks whether the punishment for a specific crime is applied consistently in similar cases[.]" *Id.* Comparative review is not required by the Constitution. *See Pulley v. Harris,* 465 U.S. 37, 53, 104 S.Ct. 871, 881, 79 L.Ed.2d 29 (1984).[13]

 Inherent proportionality review, by contrast, asks whether the punishment is grossly disproportionate to the crime and, as such, violates the Eighth Amendment's prohibition of cruel and unusual punishment. *See Pulley,* 465 U.S. at 41–42, 104 S.Ct. at 975; *Thompson v. Parker,* 867 F.3d 641, 653 (6th Cir. 2017) (describing inherent-proportionality review as "comparing the severity of the sentence to the gravity of the crime").[14] Hence, while there

is a constitutional basis for inherent proportionality review—including a "narrow proportionality principle" for non-capital sentences, *Ewing v. California,* 538 U.S. 11, 20, 123 S.Ct. 1179, 1185, 155 L.Ed.2d 108 (2003) (plurality) (internal quotation marks and citation omitted)—"there is no *constitutional* entitlement to any comparative-proportionality review." *Thompson,* 867 F.3d at 653 (emphasis added); *cf. State v. Lazada,* 107 Ohio App.3d 189, 667 N.E.2d 1292, 1294 (1995) (observing that, absent gross disproportionality between the crime and sentence, "a comparison with other sentences need not be performed" (citing *Harmelin v. Michigan,* 501 U.S. 957, 1005, 111 S.Ct. 2680, 2707, 115 L.Ed.2d 836 (1991) (plurality in relevant part))). *See generally Alleyne v. United States,* 570 U.S. 99, 116, 133 S.Ct. 2151, 2163, 186 L.Ed.2d 314 (2013) (recognizing that "broad sentencing discretion, informed by judicial factfinding, does not violate the Sixth Amendment").

As a comparative-review regime is not imposed by constitutional or statutory law, the question is whether it is required by common law, as the dissent posits. The dissent articulates that Pennsylvania has a "common law tradition," and that the CJD has a "place within our common law system." Dissenting Opinion, at 1204. The dissent concludes from these two predicates that "the CJD must follow its own precedent in fashioning and imposing sanctions, and we must review the sanctions it imposes in the same light." *Id.* It is notable, though, that the dissent does not reference

---

**13.** Such comparative proportionality review that does exist in other jurisdictions is largely limited to the capital sentencing context and is often (though not always) imposed by statute. *See State v. Cobb,* 234 Conn. 735, 663 A.2d 948, 958 n.18 (1995) (surveying jurisdictions). In Pennsylvania, proportionality review of death sentences was, for several years, statutorily mandated. *See* 42 Pa.C.S. § 9711(h)(3)(iii) (repealed). However, persons sentenced after the repeal were not entitled to

proportionality review. *See Commonwealth v. Fears,* 624 Pa. 446, 491–92, 86 A.3d 795, 822–23 (2014).

**14.** While the Eighth Amendment is the federal constitutional basis for inherent proportionality review, in relation to judicial discipline in Pennsylvania, such review is mandated by in the warranted-by-the-record prerequisite, as developed above.

any authority to support its essential thesis that, *as a matter of common law*, comparative proportionality relative to unrelated cases limits the CJD's discretion in imposing judicial discipline—or, for that matter, limits a sentencer's discretion in imposing criminal punishment. *See generally People v. Fern*, 189 Ill.2d 48, 243 Ill.Dec. 175, 723 N.E.2d 207, 210–11 (1999) (affirming that there is no common law requirement of comparative-proportionality in regard to criminal sentencing); *People v. Welsh*, 99 Ill.App.3d 470, 54 Ill.Dec. 541, 425 N.E.2d 53, 54 (1981) (explaining that "one sentence is no precedent for another"). Further, although we have explained that *stare decisis* pertains to legal holdings and not individual sentences imposed in distinct cases, the dissent fails to account for this distinction.

 In light of the above, we disagree with the dissent's effort to transform the doctrine of *stare decisis* into a requirement of comparative-proportionality review in regard to judicial discipline. We recognize that inherent proportionality review is appropriate to allow for the disapproval of a sanction grossly disproportionate to the underlying conduct. However, as in criminal sentencing—where liberty is at stake—there is nothing in our decisional law suggesting courts must undertake an analysis of distinct cases with inevitably different underlying facts to impose a vague "*stare decisis*" overlay onto the CJD's discretionary decisions. As we have explained, the framework for limited and deferential appellate review of the CJD's discretionary decisions is set forth in the state charter and embedded in this Court's precedent. That framework does not require comparative proportionality on the CJD's part, or review for the same by this Court.[15]

### E. The concurrence's objections

In her Concurring and Dissenting Opinion, Justice Todd criticizes us for allowing for such final-check review under the lawfulness inquiry, labeling it as "expansive" and expressing that it could lead to this Court "routinely weighing in on the appropriateness of the sanction imposed by the CJD and substituting its judgment for that of the CJD[.]" Concurring and Dissenting Opinion at 1196. Thus, we repeat what we have already emphasized: (a) this Court does *not* substitute its concept of the appropriate penalty for that chosen by the CJD; and (b) an unwarranted-by-the-record penalty is limited to one which is completely out of proportion to the underlying misconduct.

To the extent the concurrence indicates that the warranted-by-the-record mandate is solely directed at the CJD and does not pertain to the proper scope of this Court's review, *see id.* at 1195–96, we note that any discipline imposed by the CJD which fails to comport with its own constitutional limitations is necessarily unlawful.

Separately, the concurrence asserts that it is inappropriate for us to assess the meaning of the constitutional phrase, "warranted by the record," absent the issue having been expressly raised and discussed by the parties. *See id.* at 1195–96. As Justice Todd acknowledges, however, Appellant states in her proportionality argument that her discipline is overly harsh and unwarranted by the underlying facts (*i.e.*, the record). This subsumes a claim of "inherent disproportionality," as discussed above. As Appellant has raised the issue, we cannot avoid determining whether she is presently entitled to appellate relief on that basis. To reach such a determination,

---

**15.** Although comparative proportionality review is not constitutionally required, nothing in this opinion should be construed as prohib-
iting the CJD from undertaking such review if, in its discretion, it chooses to do so when imposing discipline.

however, we must initially discern the scope of our appellate jurisdiction as set forth in the Constitution so as to ascertain whether it permits us to consider such a claim on the merits.[16]

■ Notably, we are an appellate court and, as such, the scope of our appellate jurisdiction is cabined by the constitutional text. *See generally* PA. CONST. art V, § 2(c) (stating that this Court has such jurisdiction as is "provided by law"). Ascertaining boundaries on appellate jurisdiction is a task which appellate courts routinely undertake *sua sponte*. *See Commonwealth v. Saunders*, 483 Pa. 29, 32 n.2, 394 A.2d 522, 524 n.2 (1978); *see also Commonwealth v. Beasley*, 559 Pa. 604, 608, 741 A.2d 1258, 1261 (1999); *accord, e.g., Spiegel v. Trustees of Tufts Coll.*, 843 F.2d 38, 43 (1st Cir. 1988) (considering the propriety of a federal Rule 54(b) certification *sua sponte* because "the issue implicates the scope of

our appellate jurisdiction"); *Braswell Shipyards, Inc. v. Beazer East, Inc.*, 2 F.3d 1331, 1336 (4th Cir. 1993) (same); *Ebrahimi v. City of Huntsville Bd. of Educ.*, 114 F.3d 162, 165 (11th Cir. 1997) (same); *Province v. Province*, 196 W.Va. 473, 473 S.E.2d 894, 899 n.11 (1996) ("We are duty bound to take up the jurisdictional issue *sua sponte*, because it implicates the scope of our appellate jurisdiction.").

■ By way of rejoinder, the concurrence draws a distinction between jurisdiction and authority and asserts that this case concerns only the latter. *See* Concurring and Dissenting Opinion, at 1197–98. We respectfully disagree for the reasons mentioned above, most notably, that we are concerned with whether the merits of *any* inherent-disproportionality argument are cognizable within our appellate function in judicial discipline matters—a jurisdictional question.[17] Moreover, our deter-

16. The concurrence suggests our discussion of the scope of appellate jurisdiction is *dicta* if Appellant has, in fact, raised an inherent-disproportionality claim. *See id.* at 1196–97. In this respect, the concurrence conflates the distinct questions of whether a substantive claim has been raised, and whether this Court can reach its merits.

17. We observe, as well, that jurisdictional questions may involve issues that go beyond whether the controversy at hand falls into a general category. *Beasley*, for example, pertained to a series of post-conviction claims. *See Beasley*, 559 Pa. at 607, 741 A.2d at 1260. The post-conviction court obviously had jurisdiction over the *subject matter*, or the "general class to which the case presented for consideration belong[ed]," Concurring and Dissenting Opinion, at 1196 (citation omitted)—namely, petitions for relief filed under the PCRA. *See* 42 Pa.C.S. §§ 9543(a), 9545(a). This Court, however, acted *sua sponte* to invoke an express statutory time limitation that served as jurisdictional constraint extrinsic to the underlying subject matter. *See Beasley*, 559 Pa. at 608–09, 741 A.2d at 1261; *see also Reading Anthracite Co. v. Rich*, 525 Pa. 118, 130, 577 A.2d 881, 886 (1990) (noting that an appeal period impacts

upon an appellate court's "jurisdiction to hear and decide a controversy"); *accord United States v. Brown*, 108 F.3d 1370, 1997 WL 138864, at *1 (2d Cir. Mar. 18, 1997) (indicating that the timeliness of a defendant's notice of appeal implicated the appellate court's "jurisdictional authority" and thus could be raised *sua sponte*).

The concurrence dismisses the import of these cases and implies that application of jurisdictional limitations leads to either "further review by the court, or dismissal" of the appeal. Concurring and Dissenting Opinion, at 1197. Such a clean dichotomy does not always obtain, however. For instance, we are precluded by statute from reviewing discretionary aspects of a criminal sentence, *see* 4 Pa.C.S. § 9781(f)—a limitation this Court has recognized as jurisdictional. *See, e.g., Commonwealth v. Shiffler*, 583 Pa. 478, 484, 879 A.2d 185, 188–89 (2005). In the context of such a challenge, the appeal need not be dismissed entirely, as we retain limited appellate jurisdiction to evaluate whether the Superior Court correctly applied relevant legal principles in its resolution of a challenge to the discretionary aspects, *see Commonwealth v. Smith*, 543 Pa. 566, 570, 673 A.2d 893, 895 (1996); *Commonwealth v. Mouzon*, 571 Pa.

mination in this regard is consistent with a wide range of decisions recognizing that courts of limited jurisdiction—including appellate courts subject to jurisdictional constraints—should always act within the scope of their jurisdiction. *See, e.g., Lloyd Noland Found., Inc. v. Tenet Health Care Corp.*, 483 F.3d 773, 777 (11th Cir. 2007); *cf. Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 374, 98 S.Ct. 2396, 2403, 57 L.Ed.2d 274 (1978) ("The limits upon federal jurisdiction, whether imposed by the Constitution or by Congress, must be neither disregarded nor evaded."). Short of invoking the King's Bench power in extraordinary circumstances, *see In re Bruno*, 627 Pa. 505, 101 A.3d 635 (2014), this Court serves as a court of limited jurisdiction in review of judicial discipline imposed by the constitutionally-authorized tribunal, *i.e.*, the CJD. We thus deem it necessary and appropriate to consider the constitutional boundaries of our own limited appellate jurisdiction relative to Appellant's inherent-disproportionality argument.

## III. Conclusion

For the reasons given, the penalty imposed by the CJD was lawful. That being the case, we lack authority to overturn it.

Accordingly, the order of the Court of Judicial Discipline is affirmed.

Justices Baer, Wecht and Mundy join the opinion.

Justice Baer files a concurring opinion.

419, 427, 812 A.2d 617, 622 (2002) (plurality), and whether the sentence is illegal. *See Commonwealth v. Bradley*, 575 Pa. 141, 148–49, 834 A.2d 1127, 1131 (2003). Thus, where both discretionary aspects and legal challenges are raised, this Court reviews one but not the other, *see Commonwealth v. Walls*, 592 Pa. 557, 575, 926 A.2d 957, 968 (2007) (considering matters of law associated with a challenge to discretionary aspects, but remanding to the Superior Court to reassess its discretionary

Justice Todd files a concurring and dissenting opinion.

Justice Donohue files a dissenting opinion.

Justice Dougherty did not participate in the consideration or decision of this case.

## CONCURRING OPINION

### JUSTICE BAER

I join the majority opinion in full. I agree with the majority that Article V, Section 18(c)(2) of the Pennsylvania Constitution directs this Court to review a judicial sanction imposed by the Court of Judicial Discipline ("CJD") to determine whether the sanction is "lawful." PA. CONST. art. V., § 18(c)(2).[1] I further agree that our lawfulness inquiry is guided by Article V, Section 18(b)(5), which provides that the CJD "may order removal from office, suspension, censure or other discipline as authorized by this section and as warranted by the record." PA. CONST. art. V., § 18(b)(5). Accordingly, as the majority holds, this Court's lawfulness review encompasses an examination of whether the sanction is authorized by Section 18 and warranted by the record, *i.e.*, the sanction is not "an unreasonably harsh penalty completely out of proportion to the misconduct involved." Op. at 1190. For the reasons set forth by the majority, I agree that the CJD's sanction of removing Appellant Angeles Roca from office is, indeed, lawful.

I write separately to comment upon the majority's observation that the imposition

ruling in light of this Court's lack of jurisdiction to do so), because, as noted, the scope of our appellate jurisdiction includes one but not the other.

1. Article V, Section 18(c)(2) provides that, on the law, this Court's review is plenary; on the facts, our review is clearly erroneous; and as to sanctions, our review is whether the sanction imposed was lawful. PA. CONST. art. V, § 18(c)(2).

of discipline "not only punishes the wrong-doer, but also repairs the damaged public trust and provides guidance to other members of the judiciary regarding their conduct." Op. at 1185 (quoting *In re Berkhimer*, 593 Pa. 366, 930 A.2d 1255, 1260 (2007) (internal quotation marks and citation omitted)). I agree that the imposition of judicial discipline, by collateral consequence, acts to restore the public trust in the judiciary. The CJD may not, however, under the guise of restoring the public trust, exercise its discretion in a manner untethered to the misconduct of the accused jurist. It is not the role of the CJD to impose a more severe penalty upon a judicial officer in order to "make an example" out of the jurist or to allay the public's alleged fears of judicial dysfunction as portrayed by the media. The CJD's focus should always be on the individual judicial misconduct committed.[2] While the CJD is indisputably an independent court established by this Commonwealth's Constitution, PA. CONST. art. V. § 18(b)(1), it does not possess unbridled discretion to sanction a judicial officer in accordance with the purported whims of the CJD, the peculiar judge or judicial panel hearing the matter, or the "court of public opinion."

## CONCURRING AND DISSENTING OPINION

### JUSTICE TODD

I join the majority with the exception of its determination regarding our Court's power to review a Court of Judicial Discipline ("CJD") order on the basis of whether the sanction is "warranted by the record" pursuant to Art V, § 18(b)(5). Majority Opinion at 1190–91. Initially, I do not believe this issue was properly preserved and argued. Rather than addressing this issue, I would await targeted advocacy before deciding this significant question of the breadth of our Court's power of review. Moreover, and related thereto, I have serious concerns regarding the wisdom of our Court's review under such a warranted-by-the-record standard, given the language of the Constitution regarding our review, the history of that provision, and the resultant sweeping expansion of this Court's involvement in CJD's sanctions.

First, I do not believe this issue is properly before us. Appellant Angeles Roca does not raise Art V, § 18(b)(5) as a basis for our review in her questions presented, does not suggest such review in her statement of the scope and standard of review, and does not develop in any way the idea that our "lawfulness" review includes consideration of whether the sanction is supported by the record. At best, and as noted by the majority, Appellant contends her sanction is "unwarranted under the facts of this case, is extremely harsh and excessive and absolutely contrary to existing case law." Appellant's Brief at 49. In making these bald assertions, however, she makes no legal argument grounded on the constitutional provision on which the ma-

---

2. This is evident in the CJD's consideration of the following nonexclusive factors the CJD adopted in *In re Toczydlowski*, 853 A.2d 24 (Pa. Ct. Jud. Disc. 2004), and applied in this case: (1) whether the misconduct is an isolated instance or evidenced a pattern of conduct; (2) the nature, extent and frequency of the acts of misconduct; (3) whether the conduct occurred in or out of the courtroom; (4) whether the misconduct occurred in the judge's official capacity or in his or her private life; (5) whether the judge has acknowledged or recognized that the acts occurred; (6) whether the judge has evidenced an effort to change or modify his or her conduct; (7) the judge's length of service on the bench; (8) whether there have been prior complaints about the judge; (9) the effect the misconduct has upon the integrity of and respect for the judiciary; and (10) the extent to which the judge exploited his position to satisfy his personal desires.

jority relies, but, rather, does so only in support of her contention that our Court enjoys *de novo* review. Appellant's Brief at 58. Indeed, Appellant's two-pronged argument focuses solely on (1) whether our Court's decision in *In re Bruno*, 627 Pa. 505, 101 A.3d 635 (2014), provides for *de novo* review, and (2) her claim that the CJD erroneously failed to discuss or distinguish prior case law. It is only in the context of these issues that Appellant generically contrasts the facts in this matter with the sanction. *See, e.g.*, Appellant's Brief at 52, 58–80. In my view, she does not preserve the question of whether we, as part of our review, consider whether the sanction is "warranted by the record" pursuant to Art V, § 18(b)(5), and the majority, in an apparent effort to reach the issue, takes the above-quoted language from page 49 of Appellant's brief out of context. An issue of such constitutional magnitude should be determined only after the issue is specifically and unambiguously raised, and after pointed advocacy by the parties.

Second, I have serious concerns about divining our Constitution to provide such broad warranted-by-the-record review. First, the constitutional language regarding our Court's review of a jurist's ultimate sanction is clear and limited: we review CJD decisions for "whether the sanctions imposed were lawful." Art V, § 18(c)(2). The majority, citing our consistent prior precedent, comes to the reasonable conclusion that "lawful" is the equivalent of "available." *See, e.g.*, *In re Merlo*, 619 Pa. 1, 58 A.3d 1 (2012); *In re Lokuta*, 608 Pa. 223, 11 A.3d 427 (2011); *In re Berkhimer*, 593 Pa. 366, 930 A.2d 1255 (2007). However, the majority does not stop there, but cross-references the mandate in Section 18(b)(5), *which is directed at the CJD*, and concludes that this Court must also review for whether the sanction is "warranted by the record" as an "unavoidable corollary" to the CJD's constitutional command. Majority Opinion at 1190–91. The existence of

distinct constitutional language—directed at the CJD in Section 18(b), and directed at this Court in Section 18(c)—raises significant questions about whether such review is, or should be, part of our lawfulness review.

Further, the 1993 amendments brought to Pennsylvania a significant overhaul of the process for disciplining jurists, created the independent CJD, and circumscribed this Court's review of the discipline of judges; indeed, the amendments stripped our review authority entirely where a Justice is the subject of the discipline. *See* Pa. Const. art. V, § 18(c)(1). These amendments to our Constitution thus suggest the framers envisioned a more cabined review by our Court, rather than the more expansive one conceived by the majority.

Moreover, the ramifications of our Court reviewing for whether a sanction is "warranted by the record" gives me pause. Such review gives our Court significant power over CJD's decisions, and could lead to our Court routinely weighing in on the appropriateness of the sanction imposed by the CJD and substituting its judgment for that of the CJD under the guise of appellate review—as if the CJD were merely an advisory board. This could severely erode the independence of the CJD. Indeed, the majority's interpretation of a warranted-by-the-record review seemingly results in a standard of review more akin to that of abuse of discretion or even *de novo*—standards which would appear to be in conflict with the express constitutional language seemingly limiting our review.

Finally, the majority's tack to reach the warranted-by-the-record issue by deeming it a jurisdictional matter merits comment. Majority Opinion at 1193–94. First, the majority's discussion regarding the "scope of appellate jurisdiction" and its claim that we can thus reach the warranted-by-the-record issue *sua sponte*, constitutes *obiter dicta* if, indeed, as asserted by the majori-

ty, the issue was properly preserved. *See id.*; *see generally In re Estate of Cassell*, 334 Pa. 381, 6 A.2d 60, 61 (1939) (finding comments not necessary to decision of case are *dicta* ). Indeed, the majority elevates a simple question of issue preservation to one of constitutional jurisdictional proportions, a course we properly strive to avoid. *See, e.g., In re B.*, 482 Pa. 471, 394 A.2d 419, 421–22 (1978) ("Ordinarily, when faced with an issue raising both constitutional and non-constitutional questions, we will make a determination on non-constitutional grounds, and avoid the constitutional question if possible.").

Furthermore, the majority's assertion that we may raise this issue *sua sponte*, is misplaced, as it conflates concepts of a court's appellate jurisdiction with the scope and standard of its review. Specifically, "[j]urisdiction over the subject matter is conferred solely by the Constitution and laws of the Commonwealth. The test for whether a court has subject matter jurisdiction inquires into the competency of the court to determine controversies of the general class to which the case presented for consideration belongs." *In re Administrative Order No. 1–MD–2003, Appeal of Troutman*, 594 Pa. 346, 936 A.2d 1, 5 (2007) (citations omitted). It is foundational that jurisdictional questions may be raised *sua sponte*. However, the jurisdiction of our Court—the competency of our Court to review CJD decisions involving a judge or magisterial district judge—is plainly answered in Article V, § 18(c)(1) ("A judge or justice of the peace shall have the right to appeal to the Supreme Court in a manner consistent with rules adopted by the Supreme Court;").

As is evident from the above, the issue raised by the majority does not go to subject matter jurisdiction. Rather, it implicates the "manner of our appellate review" of CJD sanctions, i.e., our standard of review—be it *de novo* (as asserted by Appellant), limited to whether the sanction is available, or something in between as now suggested by the majority. *See* Majority Opinion at 1184–85. Contrary to the majority's claims, this is not a jurisdictional question because, regardless of what we determine our proper standard of review to be—narrow or broad—and, more specifically, regardless of whether we adopt the majority's warranted-by-the-record review, our Court retains jurisdiction to conduct its review of the CJD's decisions. Stated another way, regardless of the answer to the majority's "jurisdictional" query, we will not dismiss the appeal for wont of jurisdiction. Indeed, this fact is what makes the cases cited by the majority clearly distinguishable from this matter: in those cases, the answer to the jurisdictional question led to either further review by the court, or dismissal. Majority Opinion at 1193–94 (*citing, e.g., Commonwealth v. Saunders*, 483 Pa. 29, 394 A.2d 522, 524 n.2, 525 (1978) (determining question of final order implicates jurisdiction, and finding no final order warranted quashal of appeal); *Commonwealth v. Beasley*, 559 Pa. 604, 741 A.2d 1258, 1261–62 (1999) (addressing timeliness of PCRA petition *sua sponte*, and, as no claims satisfied exceptions to the jurisdictional time bar, affirmed denial of petition); *Reading Anthracite Co. v. Rich*, 525 Pa. 118, 577 A.2d 881, 886 (1990) (two-Justice Court) (finding appeal period goes to "jurisdiction to hear and decide a controversy")).

Moreover, the majority's citation to cases in the unique area of bifurcated sentencing jurisdiction provides no further support, reaffirms a categorical approach to jurisdiction, and actually supports the principle that questions regarding the proper standard of review are not jurisdictional. Certain of the cases cited by the majority stand for the unremarkable principle that jurisdictional issues are categorical—specifically, claims that implicate the discretionary aspects of sentencing are be-

yond the jurisdiction of our Court, while we have jurisdiction over issues which go to the legality of sentence. *See* Majority Opinion at 1194–95 n.18 (citing *Commonwealth v. Shiffler*, 583 Pa. 478, 879 A.2d 185, 188–89 (2005); *Commonwealth v. Bradley*, 575 Pa. 141, 834 A.2d 1127, 1131 (2003)). However, other decisions cited by the majority actually support my view that questions regarding the proper standard of review are not jurisdictional in nature. Specifically, in *Commonwealth v. Smith*, 543 Pa. 566, 673 A.2d 893, 895 (1996), our Court first determined that, because the question before it implicated the legality of sentence, we had jurisdiction. *Id.* Only *then* did we continue to consider the non-jurisdictional question of the proper standard of review, determining that 42 Pa. C.S. § 9781 provided that an appellate court shall vacate a sentence and remand to the sentencing court if "the sentencing court sentenced outside the sentencing guidelines and the sentence is unreasonable." *Smith*, 673 A.2d at 895. Indeed, the non-jurisdictional "unreasonableness" review in *Smith* is analogous to the question *sub judice* of whether our "lawfulness" review includes consideration of whether the sanction is "warranted by the record." Art. V, § 18(c)(2). *See also Commonwealth. v. Walls*, 592 Pa. 557, 926 A.2d 957, 962 (2007).

In short, contrary to the majority's novel jurisdictional "scope" construct, which the majority asserts may be raised *sua sponte*, questions regarding our Court's proper standard of review of CJD-imposed sanctions are non-jurisdictional and must be adequately preserved and argued by the parties before we may address them. Here, Appellant's unadorned, single-sentence argument, which cites to none of the

constitutional provisions the majority interprets, fails to preserve an issue of such constitutional import.

Accordingly, while I join the majority in large measure, I do not believe that the question of whether our Court has the authority to determine that a sanction is "warranted by the record" is before us. I would withhold any such a determination until we are presented with a case raising this issue, with focused advocacy.

## DISSENTING OPINION

### JUSTICE DONOHUE

In this appeal as of right, Philadelphia County Court of Common Pleas Judge Angeles Roca ("Roca") challenges the December 16, 2016 Order and Opinion of the Court of Judicial Discipline (the "CJD") permanently removing her from judicial office.[1] This Court must determine whether the CJD's removal sanction is "lawful" pursuant to our constitutionally prescribed standard of review regarding sanctions imposed by the CJD. *See* Pa. Const. art. V, § 18(c)(2). Specifically, we must determine whether the CJD is required to follow the discretion-limiting doctrine of stare decisis when imposing sanctions. I am of the view that the CJD is bound to do so. In holding to the contrary, the Majority, without explanation, abrogates a foundational precept of our common law system of jurisprudence and, in my view, interprets Article V, Section 18 in a way that the citizens of this Commonwealth never intended. The result is that a court of appointed judges may, with unbridled discretion, remove an elected jurist from office. For the reasons that follow, I dissent.

This Court's standard of review[2] regarding sanctions imposed by the CJD is

---

1. Roca does not dispute that she violated provisions of the Code of Judicial Conduct, engaged in conduct that prejudiced the proper administration of justice and brought her judicial office into disrepute.

2. The Majority accepts as appropriate, without analysis, the use of the term "scope of

set forth in Article V, Section 18 of the Pennsylvania Constitution:

> On appeal, the Supreme Court ... shall review the record of the proceedings of the [CJD] as follows: on the law, the scope of review is plenary; on the facts, the scope of review is clearly erroneous; and as to sanctions, the scope of review is whether the sanctions imposed were lawful. The Supreme Court ... may revise or reject an order of the [CJD] upon a determination that the order did not sustain this standard of review; otherwise, the Supreme Court ... shall affirm the order of the [CJD].

Pa. Const. art. V, § 18(c)(2). The Majority holds that we are bound only to determine whether a sanction is "lawful" and that our standard of review in this regard is perfunctory, as it only allows this Court to confirm that the sanction imposed by the CJD was "available." *See* Majority Op. at

188–89, 1190–91. In reaching this conclusion, the Majority indicates that "available" sanctions are those sanctions that the CJD may impose or, to be more specific, those sanctions listed in Article V, Section 18–namely, "removal from office, suspension, censure or other discipline ...." Pa. Const. art. V, § 18(b)(5). That sanctions must also be "warranted by the record" is, according to the Majority, the only limitation on the concept that a "lawful" sanction must merely fall "into a category which is theoretically 'available' to the CJD." Majority Op. at 1190. I challenge the Majority's interpretation of our standard of review on several grounds.

First, contrary to the Majority, I believe we must engage in meaningful constitutional interpretation regarding our intended standard of review. In interpreting constitutional language, "the fundamental rule of construction which guides [this Court] is

---

review" as a proxy for "standard of review" in Article V, Section 18(c)(2), despite this Court's express distinction between scope and standard of review:

> "**Scope** of review" refers to the confines within which an appellate court must conduct its examination. In other words, it refers to the **matters** (or "what") the appellate court is permitted to examine. In contrast, "**standard** of review" refers to the **manner** in which (or "how") that examination is conducted.

*Morrison v. Com., Dep't of Pub. Welfare, Office of Mental Health (Woodville State Hosp.)*, 538 Pa. 122, 646 A.2d 565, 570 (1994) (first and last emphasis added) (internal citations omitted). At the very least it must be acknowledged that Article V, Section 18(c)(2) was poorly drafted. It is our goal to discern the intent of the adopters of the Constitutional amendment and our rules of constitutional interpretation require us to give words their ordinary meaning and to give effect to all constitutional provisions. *See Jubelirer v. Rendell*, 598 Pa. 16, 953 A.2d 514, 528 (2008). A technical legal term in the Constitution, however, must be given the meaning understood by those sophisticated in the law at the time

of enactment. *See Robinson Twp., Washington Cty. v. Com.*, 623 Pa. 564, 83 A.3d 901, 956 (2013); *cf.* 1 Pa.C.S. § 1903(a) (technical words that have acquired a peculiar and appropriate meaning must be interpreted according to that meaning).

As to sanctions, it is clear that "scope of review," as that phrase is used in Article V, Section 18(c)(2), cannot be assigned its peculiar and appropriate meaning. It must have been intended to mean "standard of review," since the constitutional provision is concerned with the question of "how" this Court's review is conducted. Although this Court has recognized that "scope of review" and "standard of review" were "often—albeit erroneously—used interchangeably," we have also made it clear that any confusion regarding the terms was unfounded because, plainly, "the two terms carry distinct meanings and should not be substituted for one another." *Morrison*, 646 A.2d at 570. Accordingly, throughout this opinion, when discussing the manner in which this Court reviews sanctions, I use the term "standard of review." Regarding our scope of review as to sanctions, I agree with the Majority that Article V, Section 18(b)(5) requires us to review the entire record. *See* Majority Op. at 1190–91.

that the Constitution's language controls and must be interpreted in its popular sense, as understood by the people when they voted on its adoption." *Ieropoli v. AC & S Corp.*, 577 Pa. 138, 842 A.2d 919, 925 (2004). Nothing in the text of Article V, Section 18 requires us to interpret the word "lawful" as synonymous with "available." To the contrary, defining "lawful" to mean "available" strips the term of its plain and ordinary meaning. Indeed, this Court creates the definition out of whole cloth. If the adopters intended the Majority's outcome, Article V, Section 18(c)(2) would have used the term "available" and not "lawful." In my view, what is "lawful" is, plainly, that which is allowed **by the law**. In this regard, our Constitution designates the CJD as an Article V "court of record, with all the attendant duties and powers appropriate to its function." Pa. Const. art. V, § 18(b)(5). As developed later in this Dissenting Opinion, in a common law legal system such as ours, absent other discretion-limiting mechanisms, a court of record is bound by stare decisis. Decisions not tethered to that principle are ipso facto not lawful.

Although this Court has previously equated "lawful" with "available," we have never explained our rationale for excluding any other basis for finding a sanction unlawful. *See, e.g., In re Merlo*, 619 Pa. 1, 58 A.3d 1, 15 (2012) (observing that Article V, Section 18 "sets forth removal as an available sanction for bringing disrepute upon

the judicial office"); *In re Berkhimer*, 593 Pa. 366, 930 A.2d 1255, 1260 (2007) (indicating that removal was a lawful sanction because the Constitution "sets forth removal as an available sanction for bringing disrepute upon the judicial office"). The Majority offers no further insight into the basis for this constitutional interpretation. As a result, this Court's "interpretation" of our standard of review of sanctions imposed by the CJD is unsupported by important language in the provisions of our Constitution and reasoned analysis.[3]

Moreover, according to the Majority's interpretation, our standard of review amounts to nothing more than a cross-reference to confirm that the sanction imposed is one mentioned in Article V, Section 18(b)(5). Therefore, it follows that if the CJD imposes a sanction of "removal from office, suspension, [or] censure,"[4] jurists in this Commonwealth effectively have no right of judicial appeal, even though our Constitution guarantees them this right. *See* Pa. Const. art. V, § 18(c)(1) (providing that "a justice, judge or justice of the peace shall have the right to appeal a final adverse order of discipline of the [CJD]"); *see also id.*, § 9 (setting forth "a right of appeal from a court of record ... to a court of record or to an appellate court"). Remarkably, the Majority eviscerates, without an analytical or textual basis, the vertical nature of judicial review, since under the Majority's construct, this Court, the highest court in Pennsylvania, has no

**3.** Ironically, while disavowing the importance of precedent as to the CJD's decision-making process, the Majority follows the precedent of this Court to conclude that "lawful" does not encompass stare decisis, a most basic precept of the common law.

**4.** As stated, Article V, Section 18 also permits the CJD to impose "other discipline as authorized by this section ....," Pa. Const. art. V., § 18(b)(5), a phrase not directly implicated here since Roca was removed from office. However, in *In re Melograne*, 571 Pa. 490, 812

A.2d 1164 (2002), a jurist challenged, inter alia, the CJD's authority to disbar him from the practice of law. Without specific reference to our standard of review of sanctions, we determined that the CJD did not have such authority, because Article V, Section 10(c) of the Pennsylvania Constitution confers exclusive authority upon this Court to discipline attorneys. *Id.* at 1169. Accordingly, *Melograne* makes clear that the CJD's authority is inherently constrained by jurisprudential considerations beyond the confines of Article V, Section 18.

ability to meaningfully review a decision of an inferior tribunal, the CJD, despite a constitutional grant of appeal thereto. All of this is accomplished by the Majority without any attempt to discern the intent of the voters who adopted the constitutional amendment being interpreted.

It is clear that the primary reason for the amendment, especially in the eyes of the voters, was to separate the investigatory and adjudicatory functions within the disciplinary system, not to insulate this Court entirely from the process of judicial discipline. In fact, the plain language text of the proposed amendment provided to the voters in May 1993 included nothing about this Court's standard of review of sanctions and nothing to suggest that this Court should be shielded from intervention in the judicial disciplinary system generally. *See* Pittsburgh Post–Gazette, Ballot Questions, 1993 WLNR 2119966 (May 16, 1993).[5]

What is also clear is that Article V, Section 18 grew out of the work and recommendations of the Governor's Judicial Reform Commission, commonly known as the Beck Commission after its chairperson, the Honorable Phyllis Beck. *See* Pennsylvania Court of Judicial Discipline, *A Brief History of the Formation of the Court of Judicial Discipline 1993–1994*, at 2.[6] Governor Robert Casey established the twenty-three member Beck Commission by executive order on July 16, 1987, calling for an extensive re-examination of the judicial system. *Id.* The resulting "Beck Report" made recommendations regarding judicial reform in Pennsylvania. *See id.* (explaining that the Beck Commission recommended that the functions of the judicial inquiry and review board be divided between two autonomous bodies); *see also* Report of the Governor's Judicial Reform Commission (January 1988) (recommending the bifurcation of investigatory and adjudicatory processes in judicial discipline, recommending that judges and district justices have a right to appeal a decision of the adjudicatory tribunal to the Supreme Court and indicating that justices of the Supreme Court should not be permitted to judge other justices of the Supreme Court). While it would be fair to assert that the Beck Report, and the constitutional amendment that ultimately evolved therefrom, indicate a desire to insulate Supreme Court justices from discipline by the Supreme Court, nothing can be gleaned from this to support either the Majority's or Justice Todd's definition of "lawful."

We granted oral argument to consider the CJD's obligation to adhere to the doctrine of stare decisis in imposing a sanction in order for the sanction to be "lawful." In light of the Majority's disposition of this case—which, in my view, bestows upon the CJD powers that the people of this Commonwealth never intended for it to have— I begin my discussion by anchoring the doctrine of stare decisis within the broader framework of our legal system. Most nomocratic nations, i.e., nations that adhere to the rule of law, follow one of two major legal traditions that act to cabin the discretion of judges: the civil law system or the

---

**5.** The referendum question on judicial discipline read as follows:

> Shall Article V of the Pennsylvania Constitution be amended to establish a Judicial Conduct Board to investigate complaints of judicial misconduct, to establish a Court of Judicial Discipline to adjudicate charges of judicial misconduct, to abolish the Judicial Inquiry and Review Board, and, except as provided by law, to bar payment of compensation, including retirement benefits, to justices, judges, and justices of the peace suspended, removed, or barred from judicial office for serious misconduct?

Pittsburgh Post–Gazette, Ballot Questions, 1993 WLNR 2119966 (May 16, 1993).

**6.** This publication is available upon request from the Court of Judicial Discipline.

common law system.[7] In a civil law system, which predominates throughout Western Europe, South America, Asia and Africa, judges are expected to refer to large bodies of codified rules when making decisions on a case. Civil law judges do not create law and their judicial decisions are not considered a source of law for future cases. Prior decisions made by one civil law court are not binding on a subsequent court. Instead, judicial discretion is narrowly circumscribed by statute. *See* Sabrina DeFabritiis, *Lost in Translation: Oral Advocacy in a Land Without Binding Precedent*, 35 Suffolk Transnat'l L. Rev. 301, 312 (2012).

The courts of Pennsylvania, however, like courts in forty-nine [8] of the United States (and elsewhere, including Great Britain, Australia and Canada), are progeny of a common law legal tradition, born in England in the eleventh century. The common law system is characterized by adherence by judges to a body of law established through precedent. Precedent, generally speaking, refers to a prior decision or a consistent group of prior decisions that represents a model to be followed in subsequent decisions. *See id.* at 304, 328 (explaining that the "fundamental preference" of the common law involves judges applying "the decisions of their predecessors, adapting these to novel cases through reasoning by analogy").[9]

Adherence to stare decisis is a hallmark of our common law system. *Estate of Grossman*, 486 Pa. 460, 406 A.2d 726, 731 (1979) (discussing stare decisis as "the essence of common law courts today as in earlier times"). The doctrine "declares that, for the sake of certainty a conclusion reached in one case should be applied to those which follow, if the facts are substantially the same." *Commonwealth v. Mitchell*, 588 Pa. 19, 902 A.2d 430, 473 (2006) (citing *Burtt's Estate*, 353 Pa. 217, 44 A.2d 670, 677 (1945)); *see also Buckwalter v. Borough of Phoenixville*, 603 Pa. 534, 985 A.2d 728, 730 (2009) (stating that "Pennsylvania follows the doctrine of stare decisis, which promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process") (internal quotations omitted).

---

7. A failed alternative, the Court of Star Chamber—a supplement to the common law courts in England during medieval times—was born of the king's sovereign power and privileges, was not bound by the common law and lacked the safeguards that common law procedures typically provided. As a result, it became infamous for its "bizarre and excessive sentences" and was ultimately abolished by an act of Parliament in 1641. Edward P. Cheyney, *The Court of Star Chamber*, 18 Am. Hist. Rev., 729, 742–44 (1913). In the Star Chamber, "every conviction ... involved imprisonment for a longer or shorter period according to the will of the court or the pleasure of the sovereign." *Id.* at 743. When fines were imposed as punishment, "the amount of money ... was graduated rather according to the need of impressing the community than in proportion either to the immediate offense or to the ability of the culprit to pay it." *Id.* at 744.

8. Within the United States, only Louisiana maintains a hybrid legal system with elements of both civil and common law traditions. *See, generally,* Mary Garvey Algero, *The Sources of Law and the Value of Precedent: A Comparative and Empirical Study of A Civil Law State in A Common Law Nation*, 65 La. L. Rev. 775, 792 (2005); *see also In re Orso*, 283 F.3d 686, 695 (5th Cir. 2002) (recognizing that Louisiana stands alone among the fifty states in treating court decisions as secondary sources of law without stare decisis precedential effect).

9. Of course, judges in a common law system are often constrained in their decision-making by statutes as well. In many areas of law, the General Assembly's enactments provide an additional discretion-limiting layer. As discussed infra, the criminal sentencing context is one such area.

Pursuant to the doctrine, precedential decisions of this Court are binding throughout the Commonwealth, "and the precedential decisions of the lower courts bind those courts as well." *Ario v. Reliance Ins. Co.*, 602 Pa. 490, 980 A.2d 588, 599 (2009) (Castille, J., concurring); *see also Yudacufski v. Com., Dep't of Transp.*, 499 Pa. 605, 454 A.2d 923, 926–27 (1982) (holding that the trial court abused its discretion in failing to follow the established precedent set forth in another court of common pleas decision, since "[i]t is well-settled that, absent the most compelling circumstances, a judge should follow the decision of a colleague on the same court when based on the same set of facts"); *Commonwealth v. Beck*, 78 A.3d 656, 659 (Pa. Super. 2013) (acknowledging that a three-judge panel of the Superior Court "is not empowered to overrule another panel of the Superior Court" where the facts of the two cases are indistinguishable); *State Farm Mutual Automobile Insurance Company v. Department of Insurance*, 720 A.2d 1071, 1073 (Pa. Commw. 1998) (recognizing that stare decisis binds the Commonwealth Court to follow its own decisions "until they are either overruled or compelling reasons persuade us otherwise"), *aff'd*, 560 Pa. 595, 747 A.2d 355 (2000).

Stare decisis, however, is not "an iron mold into which every utterance by a Court, regardless of circumstances, parties, economic barometer and sociological climate, must be poured, and, where, like wet concrete, it must acquire an unyielding rigidity which nothing later can change." *Ayala v. Philadelphia Bd. of Pub. Ed.*, 453 Pa. 584, 305 A.2d 877, 887–88 (1973), *superseded by statute on other grounds*, Tort Claims Act, 42 Pa.C.S. §§ 8541–8542. Rather, the doctrine demands "thorough examination and deep thought" with respect to prior judicial decisions. *Id.* (quoting former Chief Justice Von Moschzisker, *Stare Decisis in Courts of Last Resort*, 37 Harv. L. Rev. 409, 414 (1924)). Thus, a court bound by stare decisis may determine that prior decisions should not be followed as controlling precedent, but it may not do so without first paying proper deference to those decisions. *Id.* If a court decides to depart from its precedent, it should provide its reasons for doing so.[10] *Id.*

While the CJD was established to play a unique role within our common law judicial system, it is indisputably situated within that system. It was created within Article V, The Judiciary, of the Pennsylvania Constitution. Pursuant to Article V, jurists (other than Supreme Court justices) are guaranteed an appeal to this Court, the highest court in the judicial branch of government. *See* Majority Op. at 1184–85 (citing Pa. Const. art. V, § 18(c)(1)). If, as the Majority suggests, the citizens of Pennsylvania had intended to create a court whose decisions need not defer to precedent—a court unlike any other in our Unified Judicial System[11] and shunning centuries of

---

**10.** A judge may intentionally object to established case law in an effort to engage in a re-evaluation of precedent, perhaps because the precedent has become irrelevant or antiquated in the contemporary climate. According to the Majority, however, the CJD is apparently empowered to reject established case law in every matter it decides, and the CJD need not even explain how the circumstances have changed from one time period to another. The CJD has now existed for twenty-four years—a little more than two decades—not centuries.

To the extent the CJD may legitimately rely on a changing contemporary climate, it should be capable of explaining the change without much difficulty.

**11.** There is no question that the CJD's placement in Article V of our Constitution indicates its establishment as a court like all others "within the Unified Judicial System over which this Court presides." *See In re Bruno*, 101 A.3d at 696 (Saylor, C.J., concurring). Our Constitution could have been amended in

our common law tradition—they would have had to expressly indicate their desire to do so. Yet nothing in Article V, Section 18, expressly or otherwise, remotely suggests that the people of this Commonwealth sought to create a court of unelected judges unconstrained by any check on its discretion to remove elected judges from office. Given its place within our common law system, the CJD is inherently bound to consider stare decisis to at least the same degree as is every other Article V court. Accordingly, the CJD must follow its own precedent in fashioning and imposing sanctions, and we must review the sanctions it imposes in the same light. In my view, this Court's proper, constitutional standard of review empowers us to vacate a CJD sanction as not "lawful" if, in imposing it, the CJD failed to adhere to stare decisis. In short, lawfulness requires the CJD to engage in a thorough examination of its prior cases. *See* Pa. Const. art. V, § 18(c)(2). Stare decisis does not require rigid application of prior cases and outcomes, but it does require the announcement of the rationale for diverging from them.

The Majority attempts to diminish the importance of stare decisis in the CJD sanctioning context by reference to our criminal sentencing regime where, the Majority suggests, judges have broad discretion to impose individualized punishment. *See* Majority Op. at 1191–92 (suggesting that the Eighth Amendment to the United States Constitution is the only limitation on such broad discretion). The Majority's line of reasoning obfuscates an important distinction between criminal sentencing and CJD sanctioning. In the context of criminal sentencing, a sentencing judge's

discretion is significantly constrained in a variety of ways, and the Eighth Amendment is by no means the only safeguard against judges handing down capricious punishments. Notably, the sentence a judge may impose in a criminal case is expressly circumscribed by statute. For each class of crime, the Sentencing Code sets forth a maximum term of imprisonment or, in the case of financial penalties, the maximum dollar amount a defendant may be fined. The court is not permitted to impose a sentence or fine that exceeds this statutory maximum under any circumstances. *See, e.g., Commonwealth v. Bradley*, 575 Pa. 141, 834 A.2d 1127, 1131 (2003) (explaining that sentences exceeding statutory maximum are illegal). In addition to the statutory maximums, judges imposing criminal sentences must also consider the general standards set forth in the Sentencing Code. *See* 42 Pa.C.S. § 9721(b). Specifically, the sentencing court is required to fashion a sentence that is "consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant." *Id.*

Moreover, pursuant to the Sentencing Code, a judge must consider the sentencing guidelines promulgated by the Pennsylvania Commission on Sentencing. In *Commonwealth v. Walls*, 592 Pa. 557, 926 A.2d 957 (2007), we explained that "consultation of the guidelines will assist in avoiding excessive sentences and further the goal of the guidelines, viz, increased uniformity, certainty, and fairness in sentencing." *Id.* at 964. The guidelines "bring greater rationality and consistency to sen-

---

a different fashion to establish the CJD. Judges on the CJD are appointed in equal number by the Supreme Court and the Governor. *See* Pa. Const. art. V, § 18(b)(1). Had the CJD been envisioned as separate and apart from our judicial system and its common law

tradition, unconstrained by the inherent discretion-limiting doctrine of stare decisis, Article IV of our Constitution, which pertains to the Executive branch, could have been amended to accommodate this new body.

tences," "eliminate unwarranted disparity in sentencing," and "serve the laudatory role of aiding and enhancing the judicial exercise of judgment regarding case-specific sentencing." *Id.* at 962, 964. Thus, while the sentencing guidelines are advisory in nature, they "must be respected and considered." *Id.* at 965. When a sentencing court imposes a sentence outside of the recommended guidelines range, it must set forth its reasons for the deviation in a written statement. *Id.* at 962–63. A sentencing court's failure to justify its departure from the guidelines is grounds for resentencing. *Id.*

None of the foregoing statutory limitations exist with respect to CJD sanctions. In my view, this fact renders adherence to stare decisis by the CJD imperative because, as demonstrated by the instant matter, no other mechanism exists to curb that court's discretion in sanctioning in any way. Stare decisis alone stands between the CJD's intended status as a fair and rationale Article V court of record, on the one hand, and a tribunal in the ilk of a discredited star chamber, on the other. *See supra*, n.7.

Contrary to the Majority's implication, Roca is not asking this Court to adopt a strict requirement of proportionality in sanctioning. *See* Majority. Op. at 1187–88.

Instead, her complaint is that the CJD's published opinion is largely devoid of any analysis of prior cases in which sanctions were imposed and makes no effort to explain its deviation from prior case law or otherwise support the sanction imposed.[12] Specifically, as observed at oral argument, the CJD ordered Roca's permanent removal from the bench without a studied review of twenty-three years' worth of CJD decisions. Roca argues that "there is a need for uniformity in judicial discipline," and that the discipline imposed cannot depend merely on "who is now serving the four year term on the CJD." Roca's Brief at 59, 79. According to Roca, the fact that the term for a judge on the CJD is four years and a judge cannot be reappointed for at least another year heightens the "importance of prior precedent," as "there cannot be a radical change in discipline" every time there is a new court. *Id.* at 60. To prevent this result, precedent must be reviewed and, when appropriate, followed.

Roca directs this Court's attention to numerous prior CJD cases imposing sanctions less severe than permanent removal from the bench, while credibly characterizing the misconduct in those cases as either more extreme or analogous to the circumstances in this case. *See id.* at 63–79.[13]

---

**12.** The CJD apparently believes it is bound to follow some of its precedent since it considered the ten factors for the imposition of sanctions it announced in *In re Toczydlowski*, 853 A.2d 24 (Pa. Ct. Jud. Disc. 2004). *See In re Roca*, 151 A.3d 739, 741–43 (Pa. Ct. Jud. Disc. 2016). In the instant matter, however, it gave no apparent weight to the factors that weighed in Roca's favor. Moreover, the non-exclusive factors set forth in *Toczydlowski* are derived from a Washington Supreme Court case, *In re Deming*, 108 Wash.2d 82, 736 P.2d 639 (1987), wherein that court makes clear that it has de novo review over sanctions recommended by the judicial qualifications commission. De novo review by the Washington Supreme Court entails a hearing after which the highest appellate court of the state

makes its own determination of the law and facts. *Id.* at 642.

**13.** *See, e.g., In re Singletary*, 967 A.2d 1094 (Pa. Ct. Jud. Disc. 2009) (magisterial district court judge's statement that motorcycle gang contributors would benefit if he was judge resulted in private reprimand); *In re Willis Berry*, 979 A.2d 991 (Pa. Ct. Jud. Disc. 2009) (common pleas court judge's use of his judicial office and secretary to run his private real estate business resulted in four month suspension); *In re Hamilton*, 932 A.2d 1030 (Pa. Ct. Jud. Disc. 2007) (drunken magisterial district court judge who physically assaulted the police chief at a public golf outing suspended for nine months with one year of probation); *In re Wade Brown*, 907 A.2d 684 (Pa. Ct. Jud.

Roca contends that her conduct is no more culpable, and in some respects less culpable, than that of the judges in these cases, and that, conversely, her sanction of permanent removal from office is far more severe than the sanctions imposed in any of these cases. *Id.* To the extent Roca's comparisons may be viewed as overly broad, it bears noting that at least three of the cases Roca cites involve a jurist who improperly rendered assistance (to himself, herself or another) in a judicial matter. *See, e.g., In re Dwight Shaner*, 142 A.3d 1051 (Pa. Ct. Jud. Disc. 2016) (senior magisterial district judge's dismissal of a complaint against a nephew of a former assistant district attorney resulted in sanction of reprimand and censure, and an order that he henceforth shall not be eligible to accept any assignments as a senior magisterial district judge); *In re Kelly Ballentine*, 86 A.3d 958 (Pa. Ct. Jud. Disc. 2013) (magisterial district court judge's dismissal of three of her own traffic court citations resulted in fifteen month suspension without pay, nineteen months of probation and a $18,296 fine); *In re Arnold*, 51 A.3d 931 (Pa. Ct. Jud. Disc. 2012) (magisterial district judge's withholding of her son's citation and failure to be forthright prejudiced administration of justice and resulted in one month suspension without pay).

Given the similarities to the case at bar, the CJD, in keeping with the discretion-limiting doctrine of stare decisis, should be expected, at the very least, to consider its decisions in these three cases when rendering its sanction decision as to Roca. The facial similarities in the facts of these cases suggest that outcomes should be similar. Since they are not, the sanctioned jurists, the rest of the judiciary and the public should know why. Such required analytical reporting by the CJD is the only restraint on its discretion. Otherwise, if it so chooses, the CJD can punish foes and reward friends with impunity.

The Majority expresses a degree of sympathy for Roca's position, but posits that "it is difficult to draw equivalence among distinct cases of judicial misconduct, as the factors involved in each instance will naturally vary." Majority Op. at 1189. This statement is true, but entirely irrelevant to the question of the application of stare decisis. It is axiomatic that no two cases are perfectly identical, but the other courts of this Commonwealth, including this Court, do not as a result abandon all efforts to follow stare decisis. That it may be challenging for the CJD to analyze, analogize or distinguish one case by reference to prior cases does not relieve that court from its inherent obligation to do so.[14]

Disc. 2006) (private reprimand for magisterial district court judge who made improper sexual comments to his staff and litigants over lengthy time period); *In re McCarthy*, 828 A.2d 25 (Pa. Ct. Jud. Disc. 2003) (magisterial district judge's consumption of alcohol when he was supposed to be performing his judicial duties resulted in six-month suspension); *In re DeLeon*, 967 A.2d 460 (Pa. Ct. Jud. Disc. 2009) (municipal court judge's use of his office to benefit a friend resulted in three-month suspension); *In re Smith*, 687 A.2d 1229 (Pa. Ct. Jud. Disc. 1996) (private reprimand for common pleas court judge who neglected to decide sixty-one cases over a three year period); *In re Daghir*, 657 A.2d 1032 (Pa. Ct. Jud. Disc. 1995) (common pleas court judge's ac-

ceptance of football tickets from a litigant in divorce matter resulted in seven-day suspension); *see also In re Larsen*, 532 Pa. 326, 616 A.2d 529 (1992) (ex parte communication with common pleas court judge resulted in private reprimand).

14. Notably, the Majority cites to cases from our sister state courts for the proposition that "past judicial misconduct cases ... are of limited usefulness," *In re Crawford*, 245 Wis.2d 373, 629 N.W.2d 1, 11 (2001), and "proportionality review based on discipline imposed in other cases ... is neither required nor determinative," *Broadman v. Comm'n on Judicial Performance*, 18 Cal.4th 1079, 77 Cal. Rptr.2d 408, 959 P.2d 715, 734 (1998). *See*

Having exempted the CJD from the doctrine of stare decisis, the Majority nevertheless posits that the "warranted-by-the-record prerequisite" of Article V, Section 18(b)(5) provides a safeguard against "an unreasonably harsh penalty completely out of proportion to the misconduct involved." Majority Op. at 1190. In addition to the patent inconsistency with the Majority's holding that sanctions need not be proportional, in my view, and as evidenced by the instant matter, this is no safeguard at all. Here, the CJD noted,

> It cannot be reasonably disputed that Judge Roca, at first, only requested advice from former Judge Waters, but then the conversation clearly fell into an agreement to obtain ex parte contacts with the judge handling her son's case. However, rather than refuse to participate in this scheme, she fully complied and willfully participated in the scheme.

*In re Roca*, 151 A.3d 739, 743 (Pa. Ct. Jud. Disc. 2016). Concluding that Roca, therefore, had acted "in derogation of the judicial canons" and had engaged in "willful misconduct"—findings that are common in almost every disciplinary case at the sanc-

tions stage—the CJD ordered Roca's permanent removal from office.

The record in this case makes clear that Roca did not "fix" or control the outcome of any case, and that her misconduct was limited to assisting her son in his efforts to open a default judgment to obtain a hearing on his tax case (in which she had no other involvement). *Id.* at 62. The city's case against him was not dismissed; in fact, he paid a negotiated tax settlement of $477.00. Majority Op. at 1180–81 (citing Stipulation, ¶¶ 30–39). Moreover, Roca expressed a deeply felt remorse regarding her involvement in the process. As Roca urges, numerous individuals testified as to her excellent character, her "workhorse" ethic, her respect for everyone in the courtroom, and her lack of any prior allegations or incidents of misconduct. Roca's Brief at 63–64.

Nonetheless, the Majority concludes, "it was not unreasonable for the CJD to conclude that Appellant's removal from the bench was an appropriate sanction in light of all of the facts of the case." Majority Op. at 1190. Here, three jurists connected by circumstance—a convicted felon, a repeat

Majority Op. at 1189–99. The cases relied on by the Majority are inapposite because the systems for judicial discipline in these states differ in important respects. In Wisconsin, the state Supreme Court imposes discipline upon judges on a de novo basis, although the recommendation of that state's judicial commission panel is entitled to deference. *In re Crawford*, 629 N.W.2d at 10. Similarly, the California Supreme Court has the power to increase or decrease a sanction after independently reviewing a disciplinary matter. The highest court makes its own findings of fact and decides as a question of law whether a sanction is warranted. *Broadman*, 959 P.2d at 734–35 (affirming a sanction of public censure after explaining that "a level of discipline may be warranted either by the existence of a pattern of misconduct or by the seriousness of a single incident").

Moreover, in *In re Crawford*, the Wisconsin Supreme Court noted that while "each case is

different, and is considered on the basis of its own facts[,] [t]his individualized approach to discipline . . . is guided by some general principles." *In re Crawford*, 629 N.W.2d at 10. Citing precedent, that Court characterized suspension and removal from office as "drastic measures, generally reserved for very serious or repeated violations of the Code. Factors considered in establishing the length of a suspension, either in aggravation or in mitigation, have included a history of prior judicial misconduct, and the presence of a remorseful and cooperative attitude." *Id.* In significant contrast, the CJD has not developed any cogent standard against which the misconduct of Pennsylvania jurists may be evaluated and judged, or any set of authoritative factors on which the public and Pennsylvania jurists could know and understand that appropriate sanctions will be imposed.

case fixer and a one-time violator for the benefit of her son—were all removed from office.[15] I am unable to discern how the "warranted by the record" prerequisite safeguards against "an unreasonably harsh penalty completely out of proportion to the misconduct involved." *See id.* at 1190. As discussed *supra,* absent any of the constraints on discretion imposed by stare decisis, and as evidenced by the circumstances of this case, the CJD is free to determine that **any** set of facts that amounts to sanctionable misconduct warrants the most extreme disciplinary consequence: removal from office of an elected official.

In connection with its "warranted by the record" analysis, the Majority posits that the United States Constitution requires only "inherent-proportionality" review in noncapital criminal sentencing decisions, pursuant to the Eighth Amendment's prohibition on cruel and unusual punishment, but does not, absent "gross disproportionality," require comparison to other sentences. *Id.* at 1191 (citing federal cases and one Ohio state court case). Arguing for a similarly limited standard of review as to CJD sanctions, the Majority characterizes the CJD's "warranted by the record" re-

quirement as that tribunal's equivalent to an Eighth Amendment "inherent proportionality" requirement, concluding that we may review for gross disproportionality between the judicial misconduct and the sanction imposed, but need not grapple with precedent in doing so. *Id.* at 1191–92 n.15; *see also id.* at 1188–89 n.13.

The previously discussed distinctions between our statutorily prescribed criminal sentencing regime and the judicial sanctioning regime set forth in Article V, Section 18 render the Majority's Eighth Amendment analogy entirely inapposite. As an initial matter, when evaluating proportionality challenges to noncapital sentences pursuant to the Eighth Amendment, we employ the three-factor test set forth in *Solem v. Helm,* 463 U.S. 277, 290–92, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983) (providing that the court must inquire into the "the gravity of the offense and the harshness of the penalty"; "the sentences imposed on other criminals in the same jurisdiction"; and "the sentences imposed for commission of the same crime in other jurisdictions"). The threshold inquiry asks whether a comparison between "the crime committed and the sentence imposed leads to an inference of gross disproportionali-

15. It would appear that Roca's removal sanction resulted, in large part, from guilt by association with former Philadelphia Municipal Court Judge Joseph C. Waters ("Waters") and former Municipal Court Judge Dawn Segal ("Segal"), who themselves were involved in a far broader range of judicial misconduct. As noted by the Majority, Waters resigned from office and pled guilty to federal corruption charges as a result of an FBI investigation into his misconduct. Separately, the CJD removed Segal from office. Majority Op. at 1179–80 n.2. In contrast to Roca's isolated ex parte communication with Waters regarding her son's tax case, Segal was found to have "engaged in repeated ex parte communications with Waters about three cases, *Houdini v. Donegal, City of Philadelphia v. Rexach,* and *Commonwealth v. Khoury.* With regard to the *Khoury* case, the record demonstrates that

[Segal] made repeated improper ex parte contacts, and later gave assurances to Waters that she would do his bidding, i.e., that these communications were used by the Respondent in her deliberations about these cases." *In re Segal,* 151 A.3d 734, 735 (Pa. Ct. Jud. Disc. 2016). Yet, when setting forth Roca's sanction, the CJD failed entirely to acknowledge that her misconduct, while culpable, was different in degree and kind than Segal's. Instead, the CJD employed identical language in drawing its disciplinary conclusions regarding both Roca and Segal: "As we have said in more detail in prior decisions, when it comes to corrupt acts and the derogation of a fair and just judicial process, a judge must have 'the willingness to stand up for what [is] right and buck a corrupt tide.'" *See id.* at 739; *see also In re Roca,* 151 A.3d at 743.

ty." *Ewing v California*, 538 U.S. 11, 30, 123 S.Ct. 1179, 155 L.Ed.2d 108 (2003). If no such inference arises, it is unnecessary to conduct a comparative analysis of sentences imposed on other criminals or in other jurisdictions. *See id.*; *see also Commonwealth v. Baker*, 621 Pa. 401, 78 A.3d 1044, 1053 (2013) (determining that "we need not reach the second and third prongs of the test for proportionality review under the Eighth Amendment" where "a threshold comparison of the gravity of a second conviction of possessing and viewing child pornography against the imposition of a mandatory sentence of at least 25 years' imprisonment does not lead to an inference of gross disproportionality").

As the Third Circuit has aptly observed, the "narrow proportionality" test set forth in *Solem* is premised upon a principle of substantial deference "to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes." *United States v. Rosenberg*, 806 F.2d 1169, 1175 (3d Cir. 1986) (quoting *Solem*, 463 U.S. at 290). It is this principle that "restrains us from an extended analysis of proportionality save in rare cases." *Id.* (citing *Solem*, 463 U.S. at 290 n.16, 103 S.Ct. 3001); *see also Commonwealth v. Eisenberg*, 626 Pa. 512, 98 A.3d 1268, 1283 (2014) (recognizing, before conducting a *Solem* analysis, that "acts passed by the General Assembly are strongly presumed to be constitutional" and "that the legislature has the exclusive power to pronounce which acts are crimes, to define crimes, and to fix the punishment for all crimes") (internal citations and quotations omitted).

In matters of judicial discipline, however, the CJD is not constrained by any principle of deference to the legislature because, as discussed *supra*, no statutes exist to regulate judicial sanctions. Accordingly, the premise underlying narrow proportionality review in the Eighth Amendment context is inapplicable as to our review of CJD sanctions. Stare decisis necessarily fills the gap as a curb to limit unbounded discretion in imposing sanctions.[16]

Our treatment of attorney misconduct cases reflects a similar principle. In the absence of statutory limitations with regard to sanctioning attorneys, this Court employs stare decisis in every attorney discipline case to determine appropriate

---

**16.** Roca has not raised an Eighth Amendment challenge and the Majority, although adopting the rubric of such a challenge, does not embrace following the three-part test for gross disproportionality. If it had done so, pursuant to *Solem*, and absent the ability to compare legislative determinations as to the gravity of distinct forms of misconduct, proportionality review of CJD sanctions under the Eighth Amendment would necessarily require comparison to CJD precedent.

The Majority's commentary regarding comparative proportionality review for Eighth Amendment purposes in the context of death penalty cases further highlights that discretion must be cabined. While Eighth Amendment comparative proportionality review is not constitutionally required, many states introduced it by statute "in an effort to limit jury discretion and avoid arbitrary and inconsistent results" following the United States Supreme Court's decision in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (determining that previous capital sentencing statutes were unconstitutional because they vested "unguided sentencing discretion in juries and trial judges"). *See Pulley v. Harris*, 465 U.S. 37, 44, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). In *Pulley*, the high Court confirmed that statutes not requiring comparative proportionality review may nonetheless satisfy the concerns expressed in *Furman* if they are "carefully drafted ... [to] ensure[ ] that the sentencing authority be given adequate information ... and standards to guide its use of that information." *Id.* at 46 (quoting *Gregg v. Georgia*, 428 U.S. 153, 194, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). The bottom line for Eighth Amendment purposes is that a sentencing authority's discretion must be circumscribed in some meaningful way.

levels of discipline. As we have explained, "[t]he final discipline imposed [on an attorney] is determined on a case-by-case basis on the totality of facts presented. Nevertheless, despite the fact-intensive nature of the endeavor, **we strive for consistency so that similar misconduct is not punished in radically different ways.**" *Office of Disciplinary Counsel v. Cappuccio*, 616 Pa. 439, 48 A.3d 1231, 1238 (2012) (internal citations and quotations omitted) (emphasis added).

In *Cappuccio*, for example, we grappled with whether to impose a sanction of disbarment (which is "properly reserved for the most egregious matters") as opposed to "the next most serious sanction, a five-year suspension." *Id.* at 1239. Noting the significance of attorney Cappuccio's position as a public official at the time he committed the misconduct in question, we conducted a lengthy analysis of his case by reference to our disciplinary decisions in more than five prior cases, comparing and contrasting the nature of the respondent's misconduct to the misconduct in those past matters. *See id.* at 1239–41. Ultimately, we honed in on our decision in *Office of Disciplinary Counsel v. Christie*, 536 Pa. 394, 639 A.2d 782 (2004), concluding that, despite the similarities between Cappuccio's misconduct and the facts in *Christie*, the former should be disbarred:

[Attorney Cappuccio] is similarly situated to attorney Christie in terms of the nature of his misconduct, his lack of disciplinary history and prior criminal record, his cooperation, character testimony, expressions of remorse, and efforts at rehabilitation. However, there are two critical distinctions supporting disbarment. First, [Cappuccio] did not present expert testimony meeting the *Braun* standard, and therefore, is not entitled to the type of consideration that was given to attorney Christie; given that Christie received the most severe sanction short of disbarment, the dis-

tinction is significant. Second, as discussed, [Cappuccio]'s position as a Chief Deputy District Attorney aggravates the misconduct, particularly in light of the facts here. At the time [Cappuccio] was engaging in his ongoing criminal conduct by endangering the welfare of minors and corrupting the morals, his public persona was that of a law enforcement figure in the county, prosecuting members of the public for similar crimes. In our view, any sanction short of disbarment in these circumstances threatens the integrity of the legal system, undermines our very serious duty to protect the public, and fails to give appropriate weight to [Cappuccio]'s status as a public official. Accordingly, given these two distinctions, which indicate that a more severe sanction than that imposed in *Christie* is warranted in this case, we conclude that disbarment is the appropriate sanction.

*Id.* at 1240–41.

The foregoing is an example of the sort of loyalty to stare decisis I would require the CJD to demonstrate when determining how to sanction jurists. There is no constitutional basis for a discrepancy and it makes no sense that attorneys in this Commonwealth are entitled to the degree of fairness and predictability that flows from adherence to precedent, while our elected judges are, as the Majority holds, stripped entirely of that right.

Again, what is "lawful" is that which is allowed by the law and there are myriad sources of the law. As one example, the Majority's breathtakingly narrow definition of our standard of review is patently violative of the United States Constitution. For example, if an available sanction were challenged as violative of the Equal Protection clause of the United States Constitution, *see* U.S. Const. amend. XIV, § 1, or on due process grounds, *see id.*, we would

be obligated to review that challenge despite the availability of the sanction. *See Driscoll v. Corbett*, 620 Pa. 494, 69 A.3d 197, 209 (2013) (explaining that state constitutions cannot eliminate rights otherwise guaranteed under the United States Constitution). It is anathema to notions of due process and basic fairness that this Court's standard of review would prohibit us from examining the constitutionality of a CJD decision merely because the sanction imposed falls into a category listed in subsection 18(b)(5). The Majority apparently agrees with me that it is beyond obvious that a lawful sanction requires that it comport with the United States Constitution, *see* Majority Op. at 1188–89 n.11, but it fails to recognize that the definition of "lawful" must therefore be considerably broader than the one it embraces here, or that its definition of "lawful" necessarily precludes the kind of review for constitutionality I discuss herein.

The Majority's reliance on the absence of an express constitutional mandate to follow stare decisis in Article V, Section 18, *see id.* at 1188–89, is meaningless. As noted, the CJD's obligation to adhere to stare decisis is inherent in its designation as an Article V court of record in Pennsylvania, where all courts of record, including this one, apply stare decisis as a matter of course. No special language is necessary to understand that the CJD must follow its own precedent. Notably, there is no express constitutional mandate for this Court or any other in the unified judicial system to follow stare decisis, but we do so regularly and without exception. Article V, Section 18 also does not mandate that the CJD follow the United States Constitution, but the Majority agrees that it must. *See* Majority Op. at 1188–89 n.11. Nor does Article V, Section 18 mandate that the CJD is limited by other provisions of the Pennsylvania Constitution, but we know that it is. *See supra* n.4 (discussing *In re Melograne*, 571 Pa. 490, 812 A.2d 1164,

1169 (2002)). Like these concepts, adherence to the doctrine of stare decisis is so fundamental to our understanding of the function of courts that inclusion is automatic in the creation of a common law court.

While purporting to uphold "our judicial system ... as the symbol of fairness and justice, and of equal protection dispensed to every citizen," *In re Roca*, 151 A.3d at 741, the CJD's decision to remove Roca from her elected office, without even a nod to the substantial body of countervailing precedent, compromises these very values. The facial lack of consistency in the imposition of sanctions demonstrated by the prior CJD cases chronicled by Roca in her brief, *see supra*, pp. 1205–06, does grave damage to any notion that the CJD itself is a symbol of fairness and justice dispensed to every citizen, as judges too are citizens of this Commonwealth. Absent fidelity to stare decisis, the CJD may arbitrarily sanction a jurist and, without the availability of meaningful appellate review, this Court has no ability to reverse it. At a minimum, it must be this Court's function, when reviewing a CJD sanctions ruling, to confirm that in reaching its decision, the lower court has engaged in a lawful judicial process which by necessity involves the application of stare decisis. In the instant matter, the CJD removed an elected judicial official from office. It imposed this sanction without any meaningful discussion of prior precedent. As such, the sanction imposed in this case is ipso facto unlawful. I would vacate the order imposing sanctions and remand for an opinion in which the CJD thoroughly examines its precedent before imposing a sanction in this case (and would require the same in every case it adjudicates). Accordingly, I dissent.